F. H. DUNBAR, Appellee, v. SPRATT-SNYDER COMPANY et al., Appellants.

No. 39403.

JUNE 24, 1929.

*Bradshaw, Schenk & Fowler* and *W. Z. Proctor,* for Eagle Indemnity Company, appellant.

*Russell E. Ostrus,* for Spratt-Snyder Company, Charles A. Spratt, and Anson Barrett, appellants.

*S. G. Van Auken* and *Wilbur J. Bridges,* for appellee.

KINDIG, J.—In July, 1926, the defendant-appellant Spratt-Snyder Company obtained a judgment against the plaintiff-appellee, F. H. Dunbar. Thereafter, execution issued to satisfy the judgment, and the defendant-appellant Anson Barrett, a constable, levied upon appellee's radio receiving set. Within due time before the sale, appellee served upon the constable a notice to release said receiving set, on the theory that it was a musical instrument, and therefore exempt, under Section 11760 of the 1924 Code. Consequently, the appellant Spratt-Snyder Company furnished the constable the statutory indemnifying bond on which the appellant Eagle Indemnity Company was surety. Then the constable proceeded with the sale. Subsequently, on December 22, 1926, the appellee commenced the present proceedings.

There is but one question to be determined, and that is whether or not a radio receiving set is a musical instrument, within the contemplation of the Iowa exemption statute. That section is 11760 of the 1924 Code, and reads as follows:

"If the debtor is a resident of this state and the head of a family, he may hold exempt from execution the following property: * * *

"3. All * * * musical instruments * * * not kept for the purpose of sale."

It is admitted that appellee is an Iowa resident and the head of a family. Too, it is conceded that he did not keep his radio receiving set for the purpose of sale. Contention is made upon the part of appellee that the modern radio receiving set is of such a character and so used that it can be said it is a musical instrument, under the exemption statute aforesaid; while appellants urge their cause in the following words:

"In its last analysis, the receiving set is simply an instrument of communication or transmission, enabling the auditor to catch sounds already present in the atmosphere, which the human ear is not rightly constructed to register."

The problem presented, therefore, must be solved upon one basis; and that is whether a radio is a musical instrument, within the purview of that statute. Hence, in the final analysis, if a radio is to be exempt, it must be upon the theory that it is a

"musical instrument." Does the radio, under a liberal construction, come within the fair meaning of said law? Such is the question.

Manifestly, an exemption statute is to be liberally construed, for the purpose of such a legislative act is humane. Its desirability is founded upon public policy. No doubt it is better that some creditor go unpaid than to take away from the debtor and his family that which the lawmakers believed is essential for their education, culture, and spiritual upbuilding. *Cook v. Allee*, 119 Iowa 226; *Swisher v. Swisher*, 157 Iowa 55. Illustration of this thought is found in *Cook v. Allee*, supra, wherein this language is used:

"Exemption statutes are the product of an enlightened public policy, which seeks to afford some measure of protection to the family of an unfortunate debtor, as well as to the debtor himself, and incidentally to the public, and are always to be liberally construed to effect their intent and purpose."

Again, the thought is expressed in *Swisher v. Swisher*, supra, in this way:

"This inquiry [the meaning of the statute] must be answered with due deference to the well established rule that the legislative language must be liberally construed, with a view to promote the beneficent purposes of the enactment."

On the other hand, it must be recognized that the exemption arises and exists only because of a statute. Every statute has its limitations. Wherefore, under the guise of liberal construction, there cannot be put into the law that which the legislature never intended should be there. Resultantly, if some subject has not been covered by legislation, or if a particular object has not been declared exempt by that body, it is not for the courts to supply that which is lacking, and, through their pronouncements, go beyond the purpose of the government's judicial department, and legislate. Many examples of this can be found in our adjudications. Sufficient for a demonstration are the following cases:

"Exemptions of property from the payment of debts is purely statutory, and courts may not enlarge the exemption * * *." *Morgan & Hunter v. Rountree*, 88 Iowa 249.

"If the property in question is exempt under the law, it must appear that the debtor is one of the classes of persons named in the statute." *Tyler v. Coulthard,* 95 Iowa 705.

"* * * this [liberal construction] does not mean that the court may, by dictum or decision, create a right of exemption where none is found in the statute * * *." *Swisher v. Swisher,* supra.

"All exemptions are statutory, and, while it is true that an exemption grant will be liberally construed to effectuate the purpose of the grant, yet we must find the grant in the statute, or no exemption can exist; and it is not for this court to say that the legislature intended a larger grant of exemptions than is given by the plain wording of the statute." *Voris v. West,* 180 Iowa 138.

As late as *Farmers Elev. & Livestock Co. v. Satre,* 196 Iowa 1076, that same thought prevails. Therein this court said:

"Appellee relies, to sustain the judgment, upon the propositions that exemption statutes are liberally construed * * *. It may be stated as the universal rule that exemption statutes are liberally construed in favor of the debtor. But, as we said in *Voris v. West,* 180 Iowa 138: '* * * it is not for this court to say that the legislature intended a larger grant of exemptions than is given by the plain wording of the statute.' "

Ambiguity does not appear in the legislative enactment before us. Can it be said, therefore, that, within the "plain wording" of the exemption statute aforesaid, a musical instrument includes a radio? What is a musical instrument? One definition is: "A contrivance by which musical sounds are produced." 32 Corpus Juris 947. Webster's New International Dictionary says a musical instrument means "a contrivance by which musical sounds are produced. Musical instruments may be classified, according to the nature of the vibrating body that initiates the sound, as stringed, wind, and those sounded by a vibratory surface." Beyond peradventure of a doubt, that was the musical instrument the Iowa legislature had in mind when it enacted said exemption statute. Obviously, a catalogue of musical instruments complete at the time the law was passed, might not include

the entire list now, because new musical instruments may have been invented during the past years. Plainly, the more recent contrivance would be exempt, under the statute, provided it is a musical instrument. That, however, is quite different from saying that something which does not have the characteristic of a musical instrument is, nevertheless, such, just because modern science perchance has discovered it. Progressiveness permits no court to read into any law that which it cannot fairly be said the legislature put there. *Bridge Proprietors v. Hoboken Co.*, 68 U. S. 116. By this is not meant that new inventions cannot be classified with the old, nor does it suggest that a contrivance not thought of when a law was passed may not, nevertheless, be included within the scope of such ancient enactment. However, this is because the new product is akin to the old and subject to classification therewith.

A fundamental idea is contained within the definition of a musical instrument. This is the capacity of the instrument, in and of itself, when properly operated, to produce or initiate the musical sound. On the other hand, a radio cannot do this. Clearly, the radio would be of no use for musical purposes, were it not for the fact that, some place in a broadcasting station, there is a musical instrument, or instruments, producing those sounds and harmonics which are pleasing to the human ear. Those musical instruments in that distant station, and not the radio, produce and initiate the music, within the definition before mentioned. Amplification by the radio of the sound called music is not effected because the sound is musical, but rather, because it is a sound. In truth, a radio is no more than an ear trumpet, which enables the human ear to catch the sounds produced by the far-away musical instrument. Some ear trumpets, like the "acousticon," are "no bigger than a dime," yet, when properly adjusted and attached to the head, aid the deaf in hearing.

Likewise, a radio is an assistance to the human ear which, without such direct attachment to the head, accomplishes an enlarged hearing. Consequently, it is evident that the radio has no more relationship to music than it has to prose, political campaign speeches, sales talks, weather forecasts, descriptions of prize fights, football games, farm talks, and numerous other matters. Mr. Stephen Davis, in his work on The Law of Radio Communication (1927) 116, says:

"His [the listener's] receiving set is merely an artificial extension of his natural sense of hearing. But by its use, the scope of audition is extended far beyond natural range, just as the telescope increases the distance of vision. Man without artificial aid can hear the voice of another only within a few hundred yards, while by radio he hears it a thousand miles or more away. He may use artifice to aid hearing, just as he may assist sight. A receiving set bears a relation to his ears similar to that of spectacles or a telescope to his eyes."

Furthermore, it is explained by appellant:

"If operated by a competent individual, and if placed within the necessary radius of an operating broadcasting station, the receiving set may be made to reduce the electrical radio frequency current emanating from the microphone of such station to vibrations capable of being heard by the human ear."

To elucidate, there is nothing peculiar about the musical sound and the radio. Forsooth, this invention is susceptible to any sound wave, whether it is musical or not. There is no connection between the radio, as such, and music, as such. The radio cannot produce music. Music never would be produced by a radio. In order for there to be music produced by an instrument, some device must exist other and different from a radio. Obviously, the instrument that produces music is not the radio. A human voice can be heard over the radio. Thus, it is not too far-fetched to ask: "Is the radio an instrument of voice? Did the radio produce the human voice?" Certainly it did not produce the spoken words that came from the human lips. Moreover, those words have no more influence upon the radio than does any other sound, however produced, whether musical or not.

Continuing the thought, it may be said that the telephone, telegraph, and the wireless transmission systems are not musical instruments, under any conception of a reasonable definition. They are not far different from the radio.

Of course, statutes upon this subject in the various states vary, and are frequently different, and what might be exempt under one law would not be within the fair purview of another. Our investigation is limited to the Iowa statute. Under it, we cannot fairly say that a radio is a musical instrument. Undoubt-

edly a debtor and his family obtain enjoyment from the operation of the radio, but that is not enough to settle the present question. No doubt the creditor and his family also enjoy the radio, but perhaps, if the debtor does not pay his obligations, the former cannot listen to the entertainment which comes through the air. Consistently, it was said in *In re Adelberger,* 280 Fed. 405:

"It is also a well recognized rule of construction that exemption laws should be liberally construed to accomplish * * * [the] end, but not construed so as to impose upon creditors."

Evidently it is for the legislature, and not the court, to say that a radio bill may go unpaid under the exemption statute.

Accusation is made by the dissenting opinion that the majority have abandoned or amended their definition of a musical instrument by adding the words "in and of itself." When properly manipulated or operated, the musical instrument will produce musical sounds "in and of itself." Amplification and explanation, rather than change, result from such suggestion; for the word "produce" itself, according to Webster's New International Dictionary, means "to bring forward, beget * * *. 4. To cause to be or to happen; to originate, as an effect or result; to bring about." "Originate," according to the same authority, denotes "to give an origin or beginning to; to bring into existence; * * * to take first existence; to have origin or beginning; to begin to exist or act." Thus the word "produce" includes the thought expressed by the phrase "in and of itself."

It seems that the sweet harmonies of music lulled the minority into a pleasantness akin to a dream, and while in that attitude, the Muse induced the writing of poetical sentences too general and rhythmic to penetrate the prose-like meaning of a statute and demonstrate a subject so practical as a legislative intent. Hills, mountains, valleys, rivers, and lakes make the echo possible, as indicated by the minority, yet that does not convert a radio into a musical instrument. Possibly the humble bugs, the birds, and the stars all create for man a sensation which, for a better name, sometimes is called music. But that, of course, does not mean a radio, under the Iowa Exemption Statute, is a musical instrument. The minority may operate their radios until the rounds of Jacob's ladder, to which they refer, are worn out by the angels, and no musical tones will ever be

heard by a human ear unless some musical instrument or human voice produces them. If an inexperienced student attempts to play a cornet or stringed instrument, it is true, as the minority state, discords will be heard. Likewise, if those sounds thus lacking harmony are sent out by a broadcasting station and picked up by a radio, they are still discordant; for the radio merely transmits that sound which has already been produced. By the application of skill, the human voice or a musical instrument can be made to produce music. Such is not true of the radio, because it is unable to originate the sound or the music, but rather, can simply amplify, and thereby assist the human ear in hearing some musical or other sound already produced by the human voice or a musical instrument.

The following, among other suggestions, has been made by appellee:

"A 'mule' might be classified as a 'horse,' under the exemption statute. * * * A piano stool is a musical instrument, within the statute; * * * A bicycle is the full equivalent of a lumber wagon * * *, likewise an automobile. A lawyer's table has been classified as an 'instrument;' and a portable sawmill as a 'tool.' "

The difficulty with the appellee's suggestions is that they are general and do not disclose the reason for those judicial pronouncements. Once more, it is to be remembered that the solution of the problem on each occasion is determined by the peculiar language of a given statute. So, when thus understood, the decisions suggested are not strange, nor do they lend aid to the position of the appellee in this case. Why can it be held that a mule is a horse? Essentially because Subdivision 18 of Section 11760, supra, of the Code, expressly by legislative enactment includes mules. A piano stool is not a musical instrument, within the statute; but it requires no stretch of the imagination to see that a piano stool is part of a musical instrument, and that the musical instrument would not be complete without the stool. We have not held "that a bicycle is the full equivalent of a lumber wagon," but rather, that it is a "vehicle," under the exemption statute. *Roberts v. Parker*, 117 Iowa 389. Intrinsically, it is such. See Webster's New International Dictionary, wherein a bicycle is defined as "a light vehicle * * *." Also, an automo-

bile is not declared to be the equivalent of a horse and wagon by judicial decision alone, but likewise it has been said by us that it is plainly a vehicle. Upon this subject, the same dictionary states: "An automobile vehicle or mechanism." True, in *Abraham v. Davenport*, 73 Iowa 111, it was said that a lawyer's table is an instrument, within the exemption statute. That legislative enactment recognized the instruments of a lawyer. See Subdivision 17, Section 11760, supra. Webster's New International Dictionary defines instrument to mean:

"That by means of which any work is performed or result is effected; one that is made a means, or is caused to serve a purpose; a medium, means, or agent."

Necessarily, then, a table in a lawyer's office would be an instrument. Throughout the list of instances where exemption has been permitted, as shown by the cases cited in appellee's brief, it is possible to associate the article claimed by the debtor with the object named in the statute.

On the contrary, however, the radio has no likeness or kindred relationship with a musical instrument. A musical instrument, if rightly manipulated, produces the harmonious sounds in and of itself, but the radio does not. Rather, the radio is an instrument "of communication or transmission, enabling the auditor to catch sounds already present in the atmosphere, which the human ear is not rightly constructed to register." Instrumental music cannot be heard through the radio unless a musical instrument somewhere has produced it. Hearing is aided by the radio, and if music is on the air, it can be brought to the human ear by the radio. Music, however, is not the only sound that can be thus amplified for the human ear; for through the radio that ear just as well may catch the sound of screeching voices, head-splitting noises, and rasping discords. A radio receiving set and a musical instrument cannot be classified together, because they are different and distinct devices.

This debtor should pay his obligation, even though he must lose the radio receiving set. Such must be so, because the legislature has not yet seen fit to exempt the radio from execution.

The judgment of the district court, therefore, should be, and hereby is, reversed.—*Reversed.*

ALBERT, C. J., and DE GRAFF, WAGNER, and GRIMM, JJ., concur.

MORLING, J., specially concurs.

EVANS, STEVENS, and FAVILLE, JJ., dissent.

MORLING, J. (specially concurring).—"Broadcasting" has been defined to be the "systematic diffusion by radio telephony of programs of music and speech and other sounds for the entertainment, information, and interest of all who are equipped with appropriate receiving apparatus." Encyclopedia Britannica (13th Ed.). I think, for present purposes, it is sufficiently correct to say that broadcasting is a species of wireless telephony, in the operation of which the microphone is the transmitter and the "radio set" is the receiver. Telephony is defined as the "art or process of reproducing sounds at a distance, as by a telephone." Webster's International Dictionary, "telephony." A musical instrument is defined as "a contrivance by which musical sounds are produced." Webster's International Dictionary, "instrument."

"A musical contrivance or apparatus for producing musical sounds,—that is, for setting up, either in a solid body or in a confined body of air, vibrations sufficiently rapid, regular, and defined to produce tones systematically related to one another. An instrument involves a vibration-producing agency, a vibratile body, usually a resonator of some kind, and various appliances for regulating pitch, the force, the duration, and often the quality of the tones produced. Instruments may be grouped by reference to any one of these characteristics. Thus, with respect to the vibration-producing agency, they are (a) inflatile, * * * (b) percussive or pulsatile * * * (c) plucked * * * (d) fricative * * *. Again, with respect to the vibratile body, instruments are (a) pneumatic * * * (b) stringed * * * (c) tongued or reed (d) tympanic * * * (e) vibrating entire * * * Again, with respect to the means of fixing the desired pitch of the tone, instruments are (a) fixed intonation * * * (b) harmonic * * * (c) of free intonation * * * Instruments may also be grouped as (a) solo, melodic; (b) concerted, harmonic, polyphonic * * *. Finally they may be grouped as (a) popular * * * or (b) or-

chestral * * *'' Century Dictionary and Cyclopedia, ''instrument.''

The radio set is not the instrument of, nor does it produce, the sound. The instrument is ordinarily at the ''studio.'' The sound which it produces is, through the microphone, ''broadcast'' or transmitted. The vibrations thus produced and transmitted are amplified and reproduced by the receiving set. Thus the music from the instrument or instruments in the ''studio'' is transmitted, and through the radio set it is received by the listener. That which is so transmitted is not necessarily music, for the program transmitted may be a musical one or it may consist of a speech, dialogue, light drama, a recitation, a market report or news report, an advertisement. A large proportion of the broadcast programs are non-musical. It seems to me that a radio set has none of the qualities of a ''musical instrument,'' as that term is properly or popularly used or understood.

EVANS, J. (dissenting).—I. I am constrained to disagree radically with the majority opinion. The record before us involves on its face the very practical question whether a radio receiving set is exempt from execution, under Section 11760 of the Code, as a musical instrument. Its decision, however, involves consideration of a field of discussion that extends into broad realms. The magnitude of the question is somewhat out of proportion to the amount involved in the case, and it comes here by certification of the trial court. The question presented is a novel one, in the sense that it has not been heretofore passed upon by any court of last resort, so far as careful search discloses. Notwithstanding the absence of precedent, the appeal has been argued here with diligence and signal ability, and this, too, by younger members of the profession. The ramifications of the discussion are extensive, and involve the question of what a ''musical instrument'' essentially is. Indirectly, also, it involves the question as to what ''music'' is, and how it is produced and how it is heard, and whence it emanates.

Our statute confers exemption from execution upon ''all musical instruments not kept for the purpose of sale.'' If the radio receiving set is a ''musical instrument,'' then it comes strictly within the terms of the exemption statute. The majority opinion reaches the conclusion that a radio set is not a musical

instrument, and is, therefore, not exempt. The conclusion reached here is that it *is* a "musical instrument," and that it is, therefore, exempt. The question which divides us is not so much one of construing the statute as it is of defining a "musical instrument," and of defining the essential functions of a radio set.

The majority opinion purports to adopt Webster's definition of a "musical instrument," as follows : "A contrivance by which musical sounds are produced." I accept this definition, and will contend for nothing that is contrary thereto. The majority opinion has not been obedient to this definition, but has transcended the same by adding materially thereto, as will presently be indicated.

The radio discovery has been full of revelation. It has revolutionized our thinking on some subjects. It has opened up a vast field of investigation in the world of sound. We think of it as something new. It is new only in the sense that the *discovery* is new. The natural law of radio thus discovered is not new, but is as old as the universe. This natural law, though undiscovered, has always been at work consistently with its present-day revelations. If it had been discovered a thousand years ago, it would have been as effective then as it is now. Nor dare we assert that such natural law has been fully discovered. Great as its unfolding has been, it may yet unfold infinitely more through still further discovery. The majority opinion makes too light of this great natural law and its relation to the world of music, and too light of the functions of the radio instrument through which this great law touches the ears of men.

In solving the problem of this case, the concrete thing set before us is a radio set in operation. Is it a musical instrument? Does it sing? Clearly it is an *instrument*. It is a contrivance, within the meaning of Webster. Is it *musical?* The primary definition of the word "musical," as given by Webster, is: "Pertaining to music." Does the radio set *pertain* to music? This raises the inquiry: What is music? How do we get it? Whence does it come, and whither, if anywhere, does it go? Do we *find* it or do we *make* it? If every "musical instrument" in the world were destroyed, and if every human voice were rendered raucous, would music be dead? True, a musical instrument *produces* music. Does it follow that music, in its essence, is the mere *production* of an instrument?

The writer of this dissent is known to his musical kin as being quite devoid of musical· capacity. He may, therefore, speak boldly on the subject, and "rush in where angels fear to tread," even as the distinguished writer of the majority opinion has done.

I find in no lexicon any definition of music that imparts any additional intelligence to the reader, however wise or otherwise he may be on the subject. Music is one of the arts. Like all the arts, it is mysterious in its essence and in its method and in its power over men. Our conception of what it is, is not acquired by words. It is so embedded in the inner consciousness of the human being and in the spirituality that dominates him that it cannot be isolated, analyzed, or defined. It comes to us through the human voice and through the voice of the animal creation and through the myriad voices of inanimate creation. It comes to us, also, through instruments which are the inventions of men. It expresses itself in an infinite variety of form. Its gamut runs from the humming of an insect to the singing of the morning stars. It comprises sound and note and tone and pitch and harmony and rhythm and melody. And if these attributes be sometimes wanting, more or less, it is music still. The new discovery of the radio has filled the human imagination with new and varying conceptions of music and its methods. The former conception was that the musical note fell upon the human ear near by and died there, never to be heard again. This conception has been staggered by the radio. One of the new conceptions is that, whenever or wherever a musical note is struck, it wings its way out like Noah's dove, seeking a place to rest its foot. The quest of the far-flung note is the human ear. The function of the radio is to find the fugitive note and to bring it home to its human destination. Under this conception, the spaces of the universe have been filled with musical notes for thousands of years, awaiting the coming of the radio through human invention.

Another new conception is that a musical note struck *anywhere* strikes *everywhere* throughout the ethereal universe. This conception of music does not confine it to this sphere or to any sphere. Like Jacob's ladder, it extends from earth to heaven,—a highway for angelic travel and a line of communication between the terrestrial and the celestial. This means that a musical note struck in New York or in Des Moines strikes also its chord within

the portals of the Infinite. Music is not the mere production of invented instruments. It has the quality of the eternal, and ante-dates all human invention. The function of musical instruments is to draw upon the eternal stores, and to feed therefrom the hungry souls of men. This conception has support in Holy Writ.

"When the morning stars sang together" (Job 38:7); "Hosanna to the Highest;" "Peace on Earth, Good Will to Men."

Such is the biblical announcement of anthems primeval,—tuned to the rhythm of the stars, and sung by The Choir Invisible. This conception has its expression in classical literature as the "music of the spheres."

Turning our consideration to the instruments through which music is produced and upon which it strikes its notes, we find them in great variety, and many of them apparently unrelated. Out of, and through, this great variety, music is carried to human ears. It comes from the mouth organ within the lips of a child; and again from the steaming nostrils of a calliope. It comes from keyboard and horn and string and bell. These are all arrayed in endless line, both small and great, from the jew's-harp, which endures for a day, to the carillon bells, dedicated to the centuries.

Such are some of the varied aspects of the mystery of music and of its relation to the many musical instruments. The radio discovery has only deepened that mystery, and has added thereto its own mystery. We know something of its practical effects. We know little of the sweep of the natural law under which it acts. Must we, therefore, solve the mystery of the radio in conception and in word before we can render decision for or against the constable?

With these preliminary observations upon the theoretical and the mysterious and the occult phases of the subject, I turn to its more practical features.

II.   I have indulged in the foregoing observations for the purpose only of illustrating the impracticability of predicating judicial decision upon an analysis of the art of music or of the radio as a discovery. The question to be decided may be turned upon more practical considerations. The action is at law. The question to be determined is essentially one of fact.

Though the case was properly tried below, and again here, on the theory that the court could properly take judicial notice of the character of the radio invention, yet the trial court invited introduction of a limited amount of evidence in aid of his judicial notice. Two witnesses were examined by each side. Each of those for the defendant testified that he would not regard the radio receiving set as a musical instrument. One of the witnesses for the plaintiff, who was a practical salesman of musical instruments, testified as follows:

"I have been with S. Davidson Bros. for 15 years, where I have charge of the musical department. The principal instruments we sell are radios, pianos, phonographs, and band instruments. Radios greatly predominate in the musical instruments we sell,—the largest month of last year, December, our radio business ran $42,000 as against $57,000 for the entire department. * * * We have innumerable people who wish to trade in phonographs and pianos for radios every day, * * * I would say the trade generally classifies them [radios] as musical instruments,— they are always handled as such in conventions which I attend."

Similar testimony was given by the second witness. The practical question presented to us is: Does the receiving radio set "pertain" to music in such a way and to such an extent that it may be fairly classified as a "musical instrument?"

We take judicial notice of the generally known practical facts concerning the use of the receiving radio. We observe that the song sung in New York is delivered at the Dunbar fireside in Des Moines. Complete concerts are thus delivered, evening after evening, and from many distant cities. Though we do not understand the mystery, or the method, we do observe and know, as a practical fact, that the radio receiving set is one of the essential instrumentalities in the accomplishment of this great result. This instrument does, therefore, *pertain* to the production of the music at this fireside; and it does so in such a practical and obvious sense that even a judge can see it, non-musical though he be. This is done commonly and habitually, not in one home, but in thousands of them; and it matters not whether such thousands be a majority or a minority.

Looking, therefore, upon the receiving radio set as commonly used in the ordinary home, and as it is regarded in the popular

mind, as well as in the commercial field, what practical reason can be suggested why it should not be deemed a "musical instrument," within the meaning of the exemption statute? This brings us to the specific consideration of the reasons advanced in the majority opinion why the radio set cannot be included in such classification.

The discussion of the majority opinion is reducible to a few cardinal reasons in support of the argument. In the consideration of these cardinal reasons, let us keep before us definitely the authorized definition of a musical instrument, as set forth in the majority opinion: "A contrivance by which musical sounds are produced."

To quote from the majority opinion:

"On the contrary, however, the radio has no likeness or kindred relationship with a musical instrument. A musical instrument, if rightly manipulated, produces the harmonious sounds *in and of itself*, but the radio does not. Rather, the radio is an instrument 'of communication or transmission, enabling the auditor to catch sounds already present in the atmosphere, which the human ear is not rightly constructed to register.'"

The italics are mine. They indicate the additional words which the opinion has added to the authoritative definition of its own selection. The authoritative definition is "A contrivance which produces music." The majority opinion cannot stand on this definition. It therefore puts forward a qualification: as "A contrivance that produces music *in and of itself*." In presenting such qualified definition, the opinion calls for an impossible attribute. There is no musical instrument which produces music *in and of itself*. Every musical instrument is dependent upon other instrumentalities. Prominent among such instrumentalities are the human finger and the human brain and the human aptitude. A musical instrument "in and of itself" is helpless to produce music. Such an instrument is not creative. It is mere material, to be acted upon by a performer; its function is essentially physical. It is a purveyor of music to the auditory nerve; and it is in such sense that it *produces* music,—not *in and of itself*. The *genius*, if any, is in the performer, and not in the instrument.

The only non-vocal music which has ever entered the human

ear is that which is carried by material musical instruments, in obedience to the hand of a performer. The instrument "in and of itself" is a dead thing.. True, it may serve a spiritual function, in that the music which it delivers to the ear·may enter also the inner being. Is it not true, therefore, that the utmost function of any musical instrument is to deliver music at the auditory door? Such is confessedly the function of the radio set, under present discovery. I suggest, therefore, that all musical instruments are material and passive, and that none are creative; that they may serve spiritual ends through spiritual agencies, which we may not understand; that these instruments are infinite in their variety; and that one variety thereof is the radio.

I quote again from the majority opinion:

"Obviously, the instrument that produces music is not the radio. A human voice can be heard over the radio. Thus, it is not too far-fetched to ask: 'Is the radio an instrument of voice? Did the radio produce the human voice?' Certainly it did not produce the spoken words that came from the human lips. Moreover, those words have no more influence upon the radio than does any other sound, however produced, whether musical or not. Continuing the thought, it may be said that the telephone, telegraph, and the wireless transmission systems are not musical instruments, under any conception of a reasonable definition. They are not far different from the radio."

The substance of the foregoing argument is that a radio cannot be conceded classification as a musical instrument because its functions are not confined to music. True, it can sing a song, but it can also speak mere words. That is, it talks, as well as sings. Is this a valid argument? Is the singer the less a singer because he also talks? May we safely say that Schumann-Heink has a musical voice? Is it less a musical voice because she uses it to talk, as well as to sing?

The further argument is put forth that the radio lacks the power of *initiating* music. That is, it is not original. The claim is that the radio merely reproduces the song already sung by another. It puts the radio in the attitude of a purloiner of the songs of others; a sort of mocking bird among the songsters. Because its production to its listener is a repetition or an echo of a song previously sung, its delivery by the radio is not its own

musical performance. It is, therefore, not a musical instrument. This argument denies the musical quality of an *echo*. I may safely say that the echo-stop, included in the great organs, has the high appreciation of all musicians. Its sole function is to preserve the echo. Is the first peal of a great organ to be deemed more musical than the appealing echoes which respond from the far corners of the auditorium? Is the first blast of an alpine horn to be deemed more musical than its reverberations resounding through the mountains and repeating themselves in ever softening tones? Apart from its native Alps, the alpine horn is not in demand. The witchery of its music is in the echoing return of the mountain. Surely no musician will condemn the echo as non-musical. Must the musical echo be deemed legally non-musical because it is an echo?

The argument here considered is further amplified in the majority opinion as follows:

"Music, however, is not the only sound that can be thus amplified for the human ear; for through the radio that ear just as well may catch the sound of screeching voices, head-splitting noises, and rasping discords. A radio receiving set and a musical instrument cannot be classified together, because they are different and distinct devices."

Here is a representation of the radio as producing "discords," as readily as music. I could wish that the majority opinion had ventured to name one musical instrument which is not capable of producing an equal discord. The instruments have no blame for their discords. Every chord has the potential of discord. Every instrument must have its performer. He is responsible for the discords. The radio has its performer. Instead of occupying a piano stool near by, he takes his place at the broadcasting end, a thousand miles away. What essential difference is there between the distant performer on the radio and the near-by performer at the piano? Each one is responsible for the production delivered by his respective instrument. The majority opinion recognizes the horn as a standard musical instrument. Would the writer be willing to accept the emanations of a tin horn as being at all times musical? Even the best of horns are dependent upon their performers. Let us put into the hands of a beginner a horn of high quality. He must needs learn. Saint-

ly is the neighbor who can bear with equanimity night after night the bellowings of a good horn at the mouth of a beginner. No one will concede that such production is musical. Does the horn lose its exemption during the period of such use? Is a tin horn non-exempt because non-musical? Is it not plain that "screeching voices, head-splitting noises, and rasping discords" can be produced upon substantially every musical instrument known? In that regard, all musical instruments classify with the radio. Why should it be said, therefore, that discord differentiates the radio from other musical instruments?

Finally, the majority opinion puts a belittling appraisal upon the thing we call "radio." To accept its argument is to imply that the radio is a freak of nature, an unsuccessful counterfeiter of music, an abortive attempt at quantity production. The radio is not such. It represents in its operation a great natural law, hitherto unknown. In the realm of this law, distance has been eliminated. Boundaries of time and space are ignored therein. Its operation cannot be localized. It is coextensive with the universe itself. It extends out to the uttermost outposts of creation, and up to the domes of the Divine Abode. It is the natural law of the realm of sound. It necessarily includes *all sound,* be it chord or discord. Music is the product of this law, and is subject to it. The operation of a radio instrument is a demonstration of the *law.* Music, in its touch with human beings, is a gainer by the discovery of it. Musical possibilities are multiplied thereby a millionfold. By its operation the musical note sung in New York is, at the same instant, sung likewise at the south pole. In short, the practical utility of the radio instrument to the enterprise of music in its service to humanity is as great as that of all other musical instruments combined. It carries every note of every one of them, not to one destination hitherto inaccessible, but to millions of them. As it serves one, so does it serve all of them, from the least to the greatest. If this be not a musical instrument, what is it?

I would christen it: The Universal Musical Instrument.

STEVENS and FAVILLE, JJ., join in this dissent.