SORENSON *v.* SECRETARY OF THE TREASURY
ET AL.

No. 84–1686.  Argued January 15, 1986—Decided April 22, 1986

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 866.

*Peter Greenfield* argued the cause for petitioner. With him on the briefs was *J. Bruce Smith.*

*Richard Farber* argued the cause for respondents. With him on the brief were *Solicitor General Fried, Assistant Attorney General Archer, Albert G. Lauber, Jr., Michael L. Paup,* and *Steven I. Frahm.**

JUSTICE BLACKMUN delivered the opinion of the Court.

The Internal Revenue Code and the Social Security Act direct the Secretary of the Treasury to "intercept" certain

---

**Joseph I. Lieberman,* Attorney General of Connecticut, and *Joseph X. Dumond, Jr.,* Assistant Attorney General, filed a brief for the State of Connecticut as *amicus curiae* urging affirmance.

tax refunds payable to persons who have failed to meet child-support obligations. In this case, the United States Court of Appeals for the Ninth Circuit ruled that payments involving earned-income credits could be intercepted. 752 F. 2d 1433 (1985). We granted certiorari, 472 U. S. 1016 (1985), because this ruling was in conflict with decisions of the Courts of Appeals for the Second and Tenth Circuits. See *Rucker* v. *Secretary of Treasury*, 751 F. 2d 351 (CA10 1984); *Nelson* v. *Regan*, 731 F. 2d 105 (CA2), cert. denied *sub nom. Manning* v. *Nelson*, 469 U. S. 853 (1984).

## I

### A

Stanley Sorenson, the husband of petitioner Marie Sorenson, was legally obligated to make child-support payments for a child of his previous marriage who was in the custody of his former wife. Mr. Sorenson was unemployed because of a disability and fell behind on those support payments. His former wife applied for welfare benefits from the State of Washington. Since 1975, the program for Aid to Families with Dependent Children (AFDC) has required, as a condition of eligibility, that applicants for welfare assign to the State concerned any right to child-support payments that has accrued at the time of assignment. Pub. L. 93–647, § 101(c)(5)(C), 88 Stat. 2359, 42 U. S. C. § 602(a)(26)(A).[1] Thus, Stanley Sorenson's former wife turned over to the State her right to collect the payments Mr. Sorenson had failed to make.

Stanley and Marie Sorenson also had their own dependent child living with them. They thus were potentially eligible

---

[1] Section 402(a)(26)(A) of the Social Security Act, as amended, 42 U. S. C. § 602(a)(26)(A), requires the assignment to the State of "any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid, and (ii) which have accrued at the time such assignment is executed."

to receive an earned-income credit. For the calendar year 1981, the time relevant to this lawsuit, § 43 of the Internal Revenue Code of 1954, as amended, provided that an individual responsible for the support of a child living with him was allowed "as a credit against the tax imposed . . . for the taxable year an amount equal to 10 percent of so much of the earned income for the taxable year as does not exceed $5,000." As the amount of the taxpayer's earned income increased, the amount of the credit decreased, reaching zero when the taxpayer's adjusted gross income reached $10,000.[2]

Unlike certain other credits, which can be used only to offset tax that would otherwise be owed, the earned-income credit is "refundable." Thus, if an individual's earned-income credit exceeds his tax liability, the excess amount is "considered an overpayment" of tax under § 6401(b), as it then read, of the 1954 Code.[3] Subject to specified setoffs,

---

[2] By the Tax Reform Act of 1984, Pub. L. 98–369, § 471(c)(1), 98 Stat. 826, Congress redesignated § 43 as § 32. By § 1042 of that Act, 98 Stat. 1043, it raised the earned-income percentage from 10 to 11 percent, the maximum amount of the credit from $500 to $550, and the eligibility ceiling from $10,000 to $11,000.

[3] At the time relevant to this lawsuit, § 6401(b) of the 1954 Code provided, in pertinent part:

"If the amount allowable as credits under sections 31 (relating to tax withheld on wages), and 39 (relating to certain uses of gasoline, special fuels, and lubricating oil), and 43 (relating to earned income credit), exceeds the tax imposed by subtitle A (reduced by the credits allowable under subpart A of part IV of subchapter A of chapter 1, other than the credits allowable under sections 31, 39, and 43), the amount of such excess shall be considered an overpayment."

Section 6401(b) was amended by the Tax Reform Act of 1984. Section 474(r)(36) of that Act, 98 Stat. 846, designated existing § 6401(b) as § 6401(b)(1) and substituted the following language for the language quoted above:

"If the amount allowable as credits under subpart C of part IV of subchapter A of chapter 1 (relating to refundable credits) exceeds the tax imposed by subtitle A (reduced by the credits allowable under subparts A, B, and D of such part IV), the amount of such excess shall be considered an overpayment."

§ 6402(a) directs the Secretary to credit or refund "any over-payment" to the person who made it.[4] An individual who is entitled to an earned-income credit that exceeds the amount of tax he owes thereby receives the difference as if he had overpaid his tax in that amount.

## B

In February 1982, petitioner and her husband timely filed a joint federal income tax return for the calendar year 1981. Petitioner had worked during part of that year, and all the Sorenson family income for the year was attributable to her wages and unemployment compensation benefits. By the return so filed, the Sorensons anticipated a refund of $1408.90, consisting in part of excess withholding on petitioner's wages and in part of an earned-income credit. The Internal Revenue Service, however, notified the Sorensons that $1,132 of the anticipated refund was being retained, under the authority granted it by the tax-intercept law, and

---

The earned-income credit remains refundable under the revised provision, since it is within the category of "refundable credits." See Tax Reform Act of 1984, § 471, 98 Stat. 825.

[4] The version of § 6402(a) in effect for the tax year 1981 provided:

"In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsection (c), refund any balance to such person."

The question presented by this case is the scope of subsection (c)—the provision governing the offset of past-due child-support payments.

Section 2653(b)(2) of the Spending Reduction Act of 1984, 98 Stat. 1155, amended § 6402(a). Under amended § 6402(a), the Secretary's authority, with respect to refunds payable after December 31, 1985, and before January 1, 1988, see § 2653(c) of the 1984 Act, 98 Stat. 1156, is restricted by a new subsection (d) as well as by subsection (c) of § 6402. Section 2653(b)(1) of the 1984 Act, 98 Stat. 1154, added the new subsection (d). Section 6402(d) requires the offset of debts owed to various federal agencies. Under § 6402(d)(2), the collection of past-due child-support payments pursuant to § 6402(c) has priority over the collection of debts covered by § 6402(d).

would be paid over to the State of Washington because that State had been assigned the right to collect Mr. Sorenson's unpaid child-support obligations. See Second Declaration of Peter Greenfield, Exh. B, *Sorenson* v. *Secretary of Treasury,* No. C82–441C (WD Wash.).

The tax-intercept law essentially directs the Secretary to give priority to a State's claim for recoupment of welfare payments made to a family who failed to receive child support, see § 402(a)(26)(A) of the Social Security Act, as amended, 42 U. S. C. § 602(a)(26)(A), over an individual's claim for refund of tax overpayment. See § 6402(a), as amended, of the 1954 Code. The intercept law originally was enacted as part of the Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub. L. 97–35, § 2331, 95 Stat. 860. First, OBRA § 2331(a) added § 464 to the Social Security Act, 42 U. S. C. § 664. That section directs the Secretaries of the Treasury and of Health and Human Services to establish a scheme by which a State is to notify the Secretary of the Treasury of persons who owe past-due child-support payments that have been assigned to it, and directs the Secretary of the Treasury to intercept tax-refund payments that would otherwise be paid to those persons:

> "Upon receiving notice from a State agency administering [an AFDC plan] . . . that a named individual owes past-due support which has been assigned to such State pursuant to section 402(a)(26), the Secretary of the Treasury shall determine whether any amounts, as refunds of Federal taxes paid, are payable to such individual (regardless of whether such individual filed a tax return as a married or unmarried individual). If the Secretary of the Treasury finds that any such amount is payable, he shall withhold from such refunds an amount equal to the past-due support, and pay such amount to the State agency (together with notice of the individual's

home address) for distribution in accordance with section 457(b)(3)." § 464(a), 42 U. S. C. § 664(a).[5]

Section 2331(c) of OBRA amended the Internal Revenue Code. It added a new subsection to the provision governing the Secretary of the Treasury's authority to refund overpayments to taxpayers. The new subsection, § 6402(c), requires the Secretary to withhold from the refund otherwise due the taxpayer the amount owed the State in past-due child support and to remit the amount withheld to the State:

> "The amount of any overpayment to be refunded to the person making the overpayment shall be reduced by the amount of any past-due support (as defined in section 464(c) of the Social Security Act) owed by that person of which the Secretary has been notified by a State in accordance with section 464 of the Social Security Act. The Secretary shall remit the amount by which the overpayment is so reduced to the State to which such support has been assigned and notify the person making the overpayment that so much of the overpayment as was necessary to satisfy his obligation for past-due support has been paid to the State. This subsection shall be applied to an overpayment prior to its being credited to a person's future liability for an internal revenue tax."

## C

After negotiations concerning the status of tax refunds in community property States such as Washington—issues that are not germane to the question now presented to this Court—the Secretary ultimately withheld only half of the refund increment the Sorensons claimed. Petitioner then filed

---

[5] Section 464(a) was amended by the Child Support Enforcement Amendments of 1984, Pub. L. 98–378, § 21, 98 Stat. 1322, which authorized the interception and diversion of refunds for the benefit of non-AFDC children as well as children receiving AFDC benefits. The Amendments also provided additional procedural protections for refund claimants whose refunds are intercepted.

a class action in the United States District Court for the Western District of Washington seeking, among other things, a declaration that § 464 of the Social Security Act did not reach a refund attributable to an excess earned-income credit. The District Court rejected the Secretary's jurisdictional arguments, which were renewed on appeal to the Court of Appeals but which are not pressed in this Court. See Brief for Respondents 5, n. 1. But it agreed with the Secretary's arguments on the merits and granted summary judgment for the Government. 557 F. Supp. 729 (1982).

The Court of Appeals affirmed that judgment. 752 F. 2d 1433 (CA9 1985). It rejected petitioner's statutory construction arguments, and held that, since the Code expressly defined excess earned-income credits as "overpayments," and disbursed those excess credits to recipients through the income tax refund process, the credits were "payable *'as'* refunds of federal taxes paid" and therefore could be intercepted. *Id.*, at 1441 (emphasis in original). Congress used the broad terms "any amounts" and "any overpayment" in the tax-intercept law and gave no indication that it intended to exclude earned-income credit payments from these terms.

The Court of Appeals also rejected petitioner's argument that the Secretary's position conflicted with Congress' intention to provide benefits to the poor through the earned-income credit. First, the legislative history of § 43 did not suggest that the earned-income credit was intended primarily as a type of welfare grant; rather, it was meant to negate the disincentive to work caused by Social Security taxes. Since the earned-income credit was payable as a lump sum, it was more like excess withholding, which was clearly reachable by the intercept program, than it was like wages, a portion of which Congress exempted from the assessment and collection process. See 752 F. 2d, at 1443, n. 1. Second, had Congress intended to exempt earned-income credit payments from the intercept program, it could have done so expressly. Instead, it provided that any amount payable

through the federal tax-refund process might be intercepted. "In the face of this rather clear statutory mandate," said the Court of Appeals, "we conclude that we are not free to speculate that Congress intended otherwise." *Id.*, at 1443.

## II

Petitioner advances two arguments to support her claim that an excess earned-income credit cannot be intercepted. First, she claims that the language and structure of the interlocking statutory provisions that make up the intercept law exclude an earned-income credit from its reach: excess earned-income credits are neither "overpayments" nor "refunds of Federal taxes paid," and only those items are subject to interception. Second, she claims that permitting interception of an earned-income credit would frustrate Congress' aims in providing the credit, and thus that Congress could not have intended the intercept law to reach earned-income credits. We find neither argument persuasive.

## A

The Internal Revenue Code's treatment of earned-income credits supports the Government's position. An individual can receive the amount by which his entitlement to an earned-income credit exceeds his tax liability only because § 6401(b) of the Code defines that amount as an "overpayment," and § 6402 provides a mechanism for disbursing overpayments, namely, the income tax refund process. The refundability of the earned-income credit is thus inseparable from its classification as an overpayment of tax. Petitioner therefore acknowledges that the excess earned-income credit is an "overpayment" for purposes of § 6402(a), the general provision that authorizes all tax refunds. See n. 4, *supra.* If it were not, the Secretary would lack authorization for refunding it to her. She claims, however, that while an excess earned-income credit is an "overpayment" for purposes of § 6402(a), it is not an "overpayment" for purposes of § 6402(c), which requires that the "amount of any overpayment . . .

shall be reduced by the amount of any past-due support" assigned to the State.

The normal rule of statutory construction assumes that "'identical words used in different parts of the same act are intended to have the same meaning.'" *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84, 87 (1934), quoting *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433 (1932). That the Internal Revenue Code includes an explicit definition of "overpayment" in the same subchapter strengthens the presumption. And that both subsections concern the tax-refund treatment of "overpayment[s]" is especially damaging to any claim that "the words, though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent." *Stockholms Enskilda Bank*, 293 U. S., at 87.

Petitioner and the two Courts of Appeals that have excluded excess earned-income credits from the definition of "overpayment" used in § 6402(c) offer two bases for their position. First, they believe that § 6402(c) limits § 6401(b)'s broad definition "by [using] the phrase 'overpayment to be refunded to the person making the overpayment.'" *Nelson* v. *Regan*, 731 F. 2d, at 111; see *Rucker* v. *Secretary of Treasury*, 751 F. 2d, at 356. Not all overpayments, they suggest, are refunded to persons who "made" them, since some—those consisting of earned-income credits—may be refunded to persons who actually have not paid any tax. We disagree. *All* refunds made by the Secretary under § 6402(a) are paid to "the person who made the overpayment." The phrase merely identifies the *person* entitled to the refund; it does not restrict the nature of the refund itself. Petitioner must characterize herself as a person who has "made" an overpayment; otherwise, she cannot claim her excess earned-income credit. The phrase in § 6402(c) on which petitioner and the Second and Tenth Circuits relied is virtually identical to the phrase used in § 6402(a). Since the words cannot have

the limiting effect petitioner proposes when used in § 6402(a), no justification exists for giving them such a construction in § 6402(c).

Second, petitioner and the Second and Tenth Circuits perceive a tension between § 6401(b)'s and § 6402(a)'s treatment of excess earned-income credits and § 464(a)'s treatment of interceptable amounts. As used in those Code sections, "overpayment" includes more than "refunds of Federal taxes paid," the phrase used in the Social Security Act. Since § 464 and § 6402(c) were enacted simultaneously as part of OBRA, petitioner and the two Circuits believe that § 6402(c) should be harmonized with § 464 rather than with §§ 6401(b) and 6402(a). See *Rucker* v. *Secretary of Treasury*, 751 F. 2d, at 357; *Nelson* v. *Regan*, 731 F. 2d., at 111.

This second argument, it seems to us, misperceives the structure of the tax-intercept law, and manufactures a tension that need not exist. OBRA's placement of provisions regarding interception in both Acts reflects a division of functions. The tax-intercept program lies at the intersection of the Social Security Act's concern in Subchapter IV, Part D, with child support, and the Internal Revenue Code's concern in Chapter 65, Subchapter A, with the treatment of credits in the tax-refund process. Section 464 addresses the concerns of the States that have received AFDC-related grants. It defines past-due child support, authorizes procedures by which the States can notify the Secretary of the Treasury of their entitlement to recover such past-due support, and directs the Secretary to aid the States, through his control over the tax-refund process, in recouping that support. Sections 6401 and 6402 address the operation of the tax-refund process under the Internal Revenue Code. They define the status of certain tax credits, set up a mechanism for disbursing refunds, and direct the Secretary to divert certain amounts from the refund process. To the extent that the tax-intercept law regulates the relationship of the Secretary of the Treasury to refund claimants, it does so through

§ 6402, and not through a provision that governs the Secretary's relationship to state agencies.

Petitioner, however, views § 6402(c)'s reference to § 464 as indicating that § 464(a) is meant to be read into § 6402(c) as a limitation on the Secretary's intercept powers. This argument depends on a somewhat strained construction of § 6402(c)'s statement that "[t]he amount of any overpayment to be refunded to the person making the overpayment shall be reduced by the amount of any past-due support . . . owed by that person of which the Secretary has been notified by a State in accordance with section 464 of the Social Security Act." Petitioner claims that "[t]he words 'in accordance with section 464 of the Social Security Act' . . . do not modify 'has been notified by a State,' as one might initially assume. Rather they belatedly modify the words 'shall be reduced.'" Brief for Petitioner 18. In petitioner's view, her construction would lead to the conclusion that a refund can be reduced only to the extent that the refund represents a refund of tax actually paid, since that is all § 464(a) permits.

We disagree with both petitioner's construction of § 6402(c) and her reading of § 464(a). First, it seems far more plausible that the words modify the nearest verb. If they are given this more natural reading, then § 6402(c) directs the Secretary to intercept only that amount which properly is classified as past-due support and of which he properly has been notified.

But even if the reference in § 6402(c) to § 464 were read to refer solely to § 464(a),[6] nothing in that subsection exempts excess earned-income credits from interception. Petitioner and the Second and Tenth Circuits recast their

---

[6] In light of Congress' specific reference to § 464(c) earlier in § 6402(c), it seems particularly likely that Congress would have referred to subsection (a) of § 464 expressly had it meant "in accordance with § 464(a)" rather than in accordance with the entire scheme for identifying past-due support payments and notifying the Federal Government of such obligations set out in § 464.

argument regarding the meaning of "overpayment" by contending that the amount of a refund that is attributable to an excess earned-income credit is not a "refun[d] of Federal taxes paid," and that § 464(a) permits interception of only "amounts, as refunds of Federal taxes paid":

> "A refund of federal taxes is a repayment of money paid by a taxpayer in excess of that taxpayer's liability. Although the earned income credit is given effect through the income tax return, the credit is not a tax refund because eligibility for the credit is not contingent upon payment of any federal income tax." *Rucker* v. *Secretary of Treasury*, 751 F. 2d, at 356.

But just as eligibility for an earned-income credit does not depend upon an individual's actually having paid any tax, the Code's classification of the credit as an "overpayment" to be refunded is similarly independent of the individual's actually having made any payment. Cf. § 6401(c). The Ninth Circuit correctly held that, to the extent an excess earned-income credit is "payable" to an individual, it is payable *as if* it were a refund of tax paid. 752 F. 2d, at 1441. Section 464(a)'s reference to the tax-refund process is best understood as a directive to the Secretary that he follow the procedures established by the Internal Revenue Code for calculating and disbursing refunds, rather than as an attempt implicitly to redefine terms given special meaning by the Code.

### B

Nor do we agree with petitioner's claim that Congress did not intend the intercept program to reach excess earned-income credits. Petitioner and the Government agree that Congress never mentioned the earned-income credit in enacting OBRA. See Brief for Petitioner 24; Tr. of Oral Arg. 21. But it defies belief that Congress was unaware, when it provided in § 6402(c) that "*any* overpayment to be refunded . . . shall be reduced by the amount of any past-due support" (em-

phasis added), that this would include refunds attributable to excess earned-income credits. Congress had previously expressly defined an excess earned-income credit as an "overpayment," in § 6401(b) of the Internal Revenue Code—the section immediately preceding the section to which Congress added the intercept provision.[7]

What petitioner and the Second and Tenth Circuits are really claiming is that the intercept law should be read narrowly to avoid frustrating the goals of the earned-income credit program. The earned-income credit was enacted to reduce the disincentive to work caused by the imposition of Social Security taxes on earned income (welfare payments are not similarly taxed), to stimulate the economy by funneling funds to persons likely to spend the money immediately, and to provide relief for low-income families hurt by rising food and energy prices.[8] Each is an undeniably important objective. It is impossible, however, for us to say that these goals outweigh the goals served by the subsequently enacted tax-intercept program—securing child support from absent

---

[7] That Congress could not have viewed the earned-income credit as immune from seizure to satisfy child-support obligations is suggested by a number of other factors as well. As the Government notes, once an individual has actually received his tax-refund payment, the proceeds of that refund, even if they reflect an earned-income credit component, are subject to levy under § 6305 of the Code. The fact that the Government may not have used this cumbersome procedure, see Tr. of Oral Arg. 23–25, reflects the economic inefficiency of locating and pursuing a payment that cannot exceed $550 rather than a lack of authority to do so. And certainly no one has suggested that the former spouse to whom a support obligation not assigned to the State is owed would be precluded from employing the judicial process to attach and seize the credit once the recipient had received it.

[8] See, e. g., S. Rep. No. 94–36, pp. 11, 33 (1975); H. R. Rep. No. 94–19, pp. 3–4, 29–31 (1975); Hearings on H. R. 2166 before the Senate Committee on Finance, 94th Cong., 1st Sess., 66, 315 (1975); Hearings before the House Committee on Ways and Means on the President's Authority to Adjust Imports of Petroleum; Public Debt Ceiling Increase; and Emergency Tax Proposals, 94th Cong., 1st Sess., 661, 742–743, 797 (1975); 121 Cong. Rec. 4609 (1975).

parents whenever possible and reducing the number of families on welfare.[9]  Congress of course could conclude that families eligible for earned-income credits have a more compelling claim to the funds involved than do either the States or non-AFDC families.  But it is equally clear that Congress could have decided that the more pressing need was to alleviate the "devastating consequences for children and the taxpayers" of the epidemic of nonsupport.  See Hearings before the Senate Committee on Finance on Spending Reduction Proposals, 97th Cong., 1st Sess., pt. 1, p. 34 (1981) (statement of Secretary Schweiker).[10]

The ordering of competing social policies is a quintessentially legislative function.  In light of Congress' decision to direct the interception of *any* overpayment otherwise refundable to a taxpayer, the Ninth Circuit correctly refused to "speculate that Congress intended otherwise."  752 F. 2d, at 1443.  Its judgment, accordingly, is affirmed.

*It is so ordered.*

---

[9] See, *e. g.*, S. Rep. No. 98–387, pp. 5–8 (1984); Hearings before the Senate Committee on Finance on Spending Reduction Proposals, 97th Cong., 1st Sess., pt. 1, pp. 19, 34–35, 81, 312 (1981); Hearings before the House Committee on Ways and Means on Tax Aspects of the President's Economic Program, 97th Cong., 1st Sess., pt. 1, pp. 159, 237 (1981).

[10] Even if Congress' sole concern were providing funds to the neediest children involved, it is far from certain that all children living in households receiving refunds of earned-income credits are needier than all children owed past-due child support.  When the earned-income credit is claimed at the end of the tax year (an individual can, pursuant to § 3507 of the Code, receive an advance on his earned-income credit over the course of the year), it may in fact go to a recipient who is not currently needy.  For example, an individual, with a dependent child, who was unemployed during most of 1981 and therefore earned only $5,000, but found a job paying $20,000 per year on January 1, 1982, would have been able to claim in a tax return filed in April 1982 an earned-income credit of $500, despite the fact that, in late spring 1982, when the refund check ultimately arrived, the individual might no longer be needy.

JUSTICE STEVENS, dissenting.

The class of persons that Congress intended to benefit by creating the "Earned Income Credit" Program in 1975 is composed entirely of low-income families.[1] The Court has fairly described the purposes of the 1975 legislation:

> "The earned-income credit was enacted to reduce the disincentive to work caused by the imposition of social security taxes on earned income (welfare payments are not similarly taxed), to stimulate the economy by funneling funds to persons likely to spend the money immediately, and to provide relief for low-income families hurt by rising food and energy prices." *Ante,* at 864.

The mechanism by which Congress funneled the funds to those persons was to treat the credits as though their recipients had overpaid their taxes, giving them a right to a "refund" of a hypothetical overpayment. This relatively obscure provision of the Internal Revenue Code gave rise to no particular difficulties for the ensuing six years.

The principal beneficiaries of the Intercept Program enacted by Congress as part of what is appropriately called the Omnibus Budget Reconciliation Act of 1981 were state governments which had claims for recoupment of welfare payments made to families that were unable to enforce a departed parent's child-support obligations. Thus, the real adversaries in this case are the Sorensons—a low-income family—on the one hand, and the State of Washington, on the other, which will ultimately receive the intercepted "refund" under the Court's holding. The question is whether Congress in 1981 intended to divert these federal funds from the original beneficiaries of the Earned Income Credit Program to the treasuries of state governments. Notwithstanding the Court's careful and admittedly accurate parsing of the language of the statute, I am not persuaded that Congress had any such intent.

---

[1] 121 Cong. Rec. 8861 (1975) (remarks of Sen. Long).

The Court confidently asserts that "it defies belief that Congress was unaware" of the impact of its Intercept Program upon the Earned Income Credit Program when it enacted OBRA in 1981. See *ante*, at 863. The Court does not pause to tell us why, if that be so, Congress did not even mention this important change at any point in the legislative history of OBRA. With all due respect to the Court and to our hardworking neighbors in the Congress, I think "it defies belief" to assume that a substantial number of legislators were sufficiently familiar with OBRA to realize that somewhere in that vast piece of hurriedly enacted legislation there was a provision that changed the 6-year-old Earned Income Credit Program.[2]

I agree that the Court's reading of the statutory language is faithful to its grammar. I am not persuaded, however, that it actually reflects the intent of the Congress that enacted OBRA. I therefore would accept the construction of the relevant statutes adopted by the Courts of Appeals for the Second and Tenth Circuits. See *Rucker* v. *Secretary of Treasury*, 751 F. 2d 351, 356–357 (CA10 1984); *Nelson* v. *Regan*, 731 F. 2d 105, 110–112 (CA2), cert. denied *sub nom. Manning* v. *Nelson*, 469 U. S. 853 (1984). I respectfully dissent.

---

[2] "Smoking a big cigar, the Speaker [of the House of Representatives] got angry again over the slap-dash quality of the bill [that became the Omnibus Budget Reconciliation Act of 1981], with parts of it photocopied from memorandums, other parts handwritten at the last minute, and some final sections hastily crossed out in whorls of pencil marks.

"But then he smiled, too, noting such cryptic and accidental entries in the bill as a name and phone number—'Ruth Seymour, 225–4844'—standing alone as if it were a special appropriation item." N. Y. Times, July 1, 1981, p. A16, col. 1.