**John M. KILLEEN, Petitioner,**

v.

**OFFICE OF PERSONNEL MANAGEMENT,
Respondent.**

No. 04–3033.

United States Court of Appeals,
Federal Circuit.

Aug. 31, 2004.

Michael L. Spekter, of Washington, DC, argued for petitioner.

Steven J. Abelson, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Kathryn A. Bleecker, Assistant Director, and Virginia G. Farrier, Attorney. Of counsel on the brief was Earl Sanders, Attorney, Office of the General Counsel, Office of Personnel Management, of Washington, DC.

Before RADER, GAJARSA, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

John M. Killeen ("Killeen") appeals from the final order of the Merit Systems Protection Board ("Board") denying his petition for review of the initial decision of an administrative judge and, consequently, affirming the Office of Personnel Management's ("OPM's") computation of Killeen's retirement annuity. *Killeen v. Office of Pers. Mgmt.*, No. CH–0831–02–0608–I–1, 2003 WL 22248819 (Sept. 23, 2003) (*"Final Order"*); *Killeen v. Office of Pers. Mgmt.*, No. CH–0831–02–0608–I–1 (Sept. 20, 2002) (*"Initial Decision"*). Because we find that subsection (f)(2) of OPM's implementing regulation, 5 C.F.R. § 831.703, is inconsistent with the statute it implements, 5 U.S.C. § 8339(p), we reverse the decision of the Board and remand for further proceedings.

## I. BACKGROUND

Killeen worked as an air traffic controller from September 6, 1981, until his retirement on September 8, 2001. Killeen worked a full-time schedule of eighty hours per eighty-hour pay period until March 30, 1997, at which time he switched to a part-time schedule of forty-eight hours per eighty-hour pay period, which he maintained until he retired.

Air traffic controllers are entitled to annuity benefits as provided by statute:

> An employee who is voluntarily or involuntarily separated from the service, except by removal for cause on charges of misconduct or delinquency, after completing 25 years of service as an air traffic controller or after becoming 50 years of age and completing 20 years of service as an air traffic controller, is entitled to an annuity.

5 U.S.C. § 8336(e) (2000). The amount of the annuity to which the air traffic controller is entitled is similarly controlled by statute:

> The annuity of an employee retiring under section 8336(e) of this title is computed under subsection (a) of this section. *That annuity may not be less than 50 percent of the average pay of the employee* unless such employee has received, pursuant to section 8342 of this title, payment of the lump-sum credit attributable to deductions under section 8334(a) of this title during any period of employment as an air traffic controller and such employee has not deposited in the Fund the amount received, with interest, pursuant to section 8334(d)(1) of this title.

5 U.S.C. § 8339(e) (2000) (emphasis added). Subsection (a), referenced above in subsection (e), provides the formula for calculating the annuity due an air traffic controller:

> Except as otherwise provided by this section, the annuity of an employee retiring under this subchapter is—
>
> (1) 1 1/2 percent of his average pay multiplied by so much of his total service as does not exceed 5 years; plus
>
> (2) 1 3/4 percent of his average pay multiplied by so much of his total service as exceeds 5 years but does not exceed 10 years; plus

> (3) 2 percent of his average pay multiplied by so much of his total service as exceeds 10 years.
>
> However, when it results in a larger annuity, 1 percent of his average pay plus $25 is substituted for the percentage specified by paragraph (1), (2), or (3) of this subsection, or any combination thereof.

5 U.S.C. § 8339(a). The "average pay" referred to in section 8339(e) is also defined by statute as:

> the largest annual rate resulting from averaging an employee's or Member's rates of basic pay in effect over any 3 consecutive years of creditable service. . . .

5 U.S.C. § 8331(4) (2000). The three highest paying years, or "high–3," are used to calculate the average pay.

As his retirement approached, Killeen calculated his annuity according to the above statutes and found a discrepancy with the amount proposed by OPM. He contacted OPM regarding the discrepancy and received a written response on September 12, 2001, explaining that the method of calculation that he used was incorrect. His error, OPM explained, was in the value of average pay used by Killeen to calculate the 50% minimum annuity limit imposed by section 8339(e). According to OPM, the correct average pay value when calculating the 50% minimum annuity amount was the high–3 average of *pay actually received* by an air traffic controller, which, in Killeen's case, occurred during his final three years of full-time service. Killeen's part-time work periods, although paid at a higher pay *rate* than his full-time service, resulted in less actual pay *received* and therefore did not count as the high–3 for the average pay calculation.

Killeen objected to OPM's use of pay received, rather than pay rates in calculating his 50% minimum annuity amount. The basis of his objection was subsection (p), which explains:

> In *computing* an annuity under this subchapter *for an employee whose service includes service that was performed on a part-time basis*—
>
> > (A) the *average pay* of the employee, to the extent that it includes pay for service performed in any position on a part-time basis, *shall be determined by using the annual rate of basic pay that would be payable for full-time service in the position;* and
> >
> > (B) *the benefit so computed shall then be multiplied by a fraction* equal to the ratio which the employee's actual service, as determined by prorating an employee's total service to reflect the service that was performed on a part-time basis, bears to the total service that would be creditable for the employee if all of the service had been performed on a full-time basis.

5 U.S.C. § 8339(p)(1) (emphases added). According to Killeen's proposed methodology, subsection (p) requires the 50% minimum annuity amount to be calculated with an average pay value using a high–3 based on the deemed full-time pay rate (i.e., what he would have received if paid at the same rate as paid for his part-time service for full-time service). The resulting benefit should then be reduced according to the proration factor prescribed in subsection (p)(1)(B). OPM rejected this methodology, explaining that subsection (p) applied only to the annuity calculations under section 8339(a)—not to the 50% minimum annuity

calculation required by section 8339(e). According to OPM, the 50% minimum continued to use the definition of average pay in existence before the enactment of section 8339(p). Under the old definition, OPM explained, the high–3 values were based on pay actually received by the retiree rather than the deemed full-time pay rates described in subsection (p).[1]

Killeen began receiving his annuity payments in October of 2001, following his retirement. On January 10, 2002, Killeen received a letter from OPM explaining to him that it had miscalculated his annuity amount and that, as a result of the miscalculation, he should have been receiving more than he actually received during the October–January periods. The error, OPM explained, was that it had failed to compare the annuity amount calculated pursuant to the formula in section 8339(a) to the 50% minimum annuity amount as required by section 8336(e). The 50% minimum, it turns out, exceeded the annuity amount calculated under the section 8339(a) formula. In concluding its letter, OPM explained that, in calculating the 50% base amount, it had used a high–3 average that was based on the last three years that Killeen had worked full time as an air traffic controller. OPM selected those three years because they were the highest compensation amounts received by Killeen during his twenty-year employment.

Killeen unsuccessfully sought reconsideration of his annuity calculation by OPM. In denying his request, OPM reiterated the methodology set out in its previous letter, citing one of its regulations as additional support. That regulation, 5 C.F.R. § 831.703(f)(2), states that the deemed av-

---

1. Subsection (p) was enacted on April 7, 1986 as part of Pub.L. No. 99–272, 100 Stat. 82, 334–35 (1986). Section 15204(c) of the Act explains that the "amendments made by [section 15204 are] effective with respect to ser- vice performed on or after the date of the enactment of [the] Act." When calculating annuities, therefore, subsection (p) only ac- counts for part-time service occurring after April 7, 1986.

erage pay of section 8339(p) does not apply to the 50% minimum annuity calculation in section 8339(e). Based on the statutes and its regulation, OPM concluded that "[Killeen's] proposed methodology reflects an inaccurate interpretation of statutory construction and it's [sic] implementation would result in the creation of an annuity computation formula and payment of a retirement benefit that is not otherwise expressly provided for by law or regulation."

Killeen appealed OPM's decision to the Board, where an Administrative Judge affirmed without notable change. The Administrative Judge described the annuity computation for air traffic controllers as choosing "the larger of the rate of annuity computed according to 5 U.S.C. § 8339(p) as implemented by 5 C.F.R. § 831.703 or 50% of the *actual earned average pay* of the employee according to 5 U.S.C. § 8339(e)." *Initial Decision,* slip op. at 4 (emphasis added). Killeen filed a petition for review of the Administrative Judge's decision with the Board. Killeen's petition was denied, causing the Administrative Judge's decision to become final. *Final Order,* slip op. at 2. Killeen timely appealed the decision to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## II. DISCUSSION

### A. *Standard of Review*

■ Our review of board decisions is limited under 5 U.S.C. § 7703(c). A final board decision may be reversed only if that decision is found to be: (1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) obtained without procedures required by law; or (3) unsupported by substantial evidence. *Farrell v. Dep't of Interior,* 314 F.3d 584, 589 (Fed.Cir.2002).

### B. *Analysis*

#### 1. Level of Deference

OPM's regulation, 5 C.F.R. § 831.703(f)(2), plainly prohibits the use of the deemed annual pay methodology of subsection (p) when calculating the 50% minimum annuity for air traffic controllers under section 8339(e). It was promulgated pursuant to OPM's authority to "prescribe such regulations as are necessary and proper to carry out" section 8339. 5 U.S.C. § 8347(a) (2000). Instead of following the usual notice-and-comment procedures, however, OPM promulgated the regulation under the "good cause" exception contained in 5 U.S.C. § 553(b)(3)(B). Consequently, although OPM did receive nineteen comments on the regulation, the regulation did not undergo the full rigor of notice-and-comment formalities. *See* 52 Fed.Reg. 1621, 1622 (Jan. 15, 1987) (invoking the good cause exception to notice requirements of APA).

■ OPM identifies *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), as the appropriate level of deference for our review of its regulatory interpretation of section 8339. Under *Chevron,* courts apply a "two-part inquiry in cases in which a court reviews an agency's construction of a statute that it administers." *Stearn v. Dep't of the Navy,* 280 F.3d 1376, 1382 (Fed.Cir.2002). First, a court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. If the intent of Congress is not clear, the second part of the inquiry requires a court to assess "whether the agency's answer is based on a permissible construction of the statute."

*Id.* at 843, 104 S.Ct. 2778. An agency's interpretation will be respected so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778.

■ Deference under *Chevron,* however, is only warranted where Congress authorized an agency to make rules carrying the force of law, and the agency has exercised that authority. *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Where *Chevron* does not apply, the agency's interpretation may still be afforded some deference according to a variety of factors to be considered by a reviewing court. *See id.* at 228, 121 S.Ct. 2164 (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). These factors include "the degree of the agency's care, its consistency, formality, and relative expertness, and … the persuasiveness of the agency's position." *Mead Corp.,* 533 U.S. at 228, 121 S.Ct. 2164 (citations omitted).

The appropriate deference due a regulation promulgated under the exception of section 553(b)(3)(B) does not appear to have been addressed by any court subsequent to the Supreme Court's decision in *Mead.* We need not resolve the issue for this appeal, however, as we find that the intent of Congress in enacting subsection (p) is clear. Under any degree of deference, therefore, OPM's regulation fails.

## 2. Statutory Interpretation

Killeen's statutory argument is straightforward. He acknowledges that OPM previously used the actual salary received by a government employee when determining the high–3 salary years for purposes of calculating that employee's average pay. He asserts, however, that the addition of section 8339(p) in 1986 terminated that practice for periods of employment occurring after April 6, 1986, involving part-time service. With the addition of section 8339(p), Killeen explains, annuities based in part on part-time service are calculated using the deemed full-time *rate* of pay, and the resulting annuity benefits prorated to account for the part-time service. OPM agrees with Killeen's interpretation of section 8339(p) for calculations made under the formula in section 8339(a), but does not agree that the average pay provisions of section 8339(p) apply when calculating section 8339(e)'s 50% minimum.

■ The starting point of any statutory analysis is, of course, the language of the statute. *Raney v. Fed. Bureau of Prisons,* 222 F.3d 927, 931 (Fed.Cir.2000) (en banc). As explained above, section 8331(4) defines "average pay" as an average "rate" of pay. 5 U.S.C. § 8331(4). As OPM correctly points out, however, this has historically been interpreted as meaning the amount actually received. The Court of Appeals for the District of Columbia Circuit so held based on a variety of factors, including the dependence of "average pay" on the definition of "basic pay," which it determined to be pay actually received by an employee, congressional concern over the cost of the civil service retirement system reflected in the legislative history, and the statutory structure. *Am. Postal Workers Union v. U.S. Postal Serv.,* 707 F.2d 548, 562–64 (D.C.Cir.1983) ("*APWU* "). In addition to the District of Columbia Circuit's decision in *APWU,* OPM relies heavily on the legislative history surrounding the enactment of the air traffic controller retirement provisions, sections 8336(e) and 8339(e).

The flaw in OPM's reliance on these sources is their timing, as they all pre-date the 1986 amendment that added subsection (p). While these sources are relevant to interpreting the unamended statutory provisions, they are not necessarily indicative of the meaning of the provisions following

the addition of subsection (p). Killeen's argument is exactly that: the addition of section 8339(p) in 1986 altered the definition of "average pay" articulated by the District of Columbia Circuit in *APWU.* We agree with Killeen's assertion.

■ Section 8339(p) explains:

In *computing* an annuity under this subchapter *for an employee whose service includes service that was performed on a part-time basis—*

> (A) the average pay of the employee, to the extent that it includes pay for service performed in any position on a part-time basis, shall be determined by using the annual rate of basic pay that would be payable for full-time service in the position; ...

5 U.S.C. § 8339(p) (emphases added). Subsection (p) unambiguously modifies the definition of "average pay" when "computing" annuities under subchapter III of chapter 83 of Title 5—a subchapter that includes the annuity calculations in section 8339(e)—if the work history of a retiring employee includes a period of part-time service. Instead of considering only pay received, subsection (p)—without exception—requires OPM to calculate the annuities using the annual rate that would have been payable had that employee been employed in full-time service. *IXechem Intern., Inc. v. University of Tex. M.D. Anderson Cancer Centerd.* The benefit calculated is then prorated to account for part-time service as specified in section 8339(p)(1)(B).[2]  5 C.F.R. § 831.703(f)(2), which excepts the 50% minimum annuity amount of section 8339(e) from the pur-

view of subsection (p), is inconsistent with the clearly expressed intent of Congress and therefore fails under any level of judicial deference. *See Thai Pineapple Canning Indus. Corp. v. United States,* 273 F.3d 1077, 1083 (Fed.Cir.2001).

Although its review is unnecessary here, the legislative history surrounding subsection (p) confirms this as the correct interpretation. *White v. Dep't of Justice,* 328 F.3d 1361, 1374 (Fed.Cir.2003). As both parties point out, Congress clearly described the loophole that it intended to close with the enactment of the subsection. *See* S.Rep. No. 99–146, at 433 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 392. Under the old interpretation of "average pay" announced in *APWU*, a government employee could work a career in government service almost entirely on a part-time schedule, yet still receive an annuity upon retirement commensurate with their full-time co-workers by shifting to a full-time schedule during their final three years of government service. As the pay received in these final three years of full-time service typically exceeded the pay received for any year of part-time service, under the old interpretation the three full-time service years became the high–3 salary used in OPM's average pay calculation. The employee's annuity, which was calculated directly from average pay, became similarly inflated. *Id.* With subsection (p), Congress attempted to eliminate the statutory windfall to part-time employees by creating parity in the average pay calculation for full- and part-time employees and adjusting for part-time service later at the annuity-calculation stage.

---

**2.** At oral argument, counsel for OPM stressed that subsection (p)(1)(A) could not be applied in the absence of the proration of subsection (p)(1)(B). We agree, but do not see why this poses any more difficulty than it does when applying part (B) to the formula in section 8339(a). While accounting for pre- and post-

1986 employment, *see supra* note 1, in addition to prorating for periods of part-time and full-time service is complicated, OPM has demonstrated with the elaborate spreadsheet calculations included in the joint appendix that it is not impossible. We suspect the same can be done for the 50% limitation.

Killeen correctly explains that precluding the application of section 8339(p) to the 50% minimum of section 8339(e), as OPM's regulation does, has the effect of preserving the very loophole that Congress intended to close. Applying OPM's regulation in the circumstances described above (i.e., an employee working a predominantly part-time career and then shifting to full time for their final three years), the high–3 salary average *for the 50% calculation* continues to be calculated under the old interpretation of "average salary," using the actual compensation received by the employee. Under OPM's regulation, an enterprising part-timers may still receive 50% of his final three years' salary regardless of his actual work history—exactly the practice that Congress attempted to end with subsection (p). Thus, in addition to finding no support in the statutory language, OPM's regulation is inconsistent with the statute's stated congressional purpose.

OPM makes a variety of arguments in defense of its regulation. It engages in an in-depth review of the history and rationale of Congress's special treatment of air traffic controllers. Again, this history is instructive on the background of the statute but sheds no light on the effect of section 8339(p). OPM also argues that, had Congress intended to change the definition of average pay, it could have modified section 8331(4) directly. While OPM is correct that Congress could have amended the definition of average pay directly, the fact is that Congress did not. What we are left with is the unambiguous language of section 8339(p), which explains that it applies broadly to all annuities computed under the subchapter. That Congress could have placed the provision elsewhere is without consequence.

OPM's final argument depends on a fine parsing of the text of subsection (p). According to OPM, subsection (p)'s instruction to use the deemed average pay only when "computing an annuity" limits its application in section 8339(e) to the formula of section 8339(a) incorporated by reference. OPM finds support for its argument in section 8339(e), which explains that "[t]he annuity of an employee retiring under section 8336(e) of this title *is computed* under subsection (a) of this section. That annuity may not be less than 50 percent of the average pay of the employee...." 5 U.S.C. § 8339(e). Based on section 8336(e)'s use of "is computed," OPM argues that the deemed average salary of section 8339(p) applies only to the annuity "computed" in section 8339(a). The 50% minimum annuity provision in section 8339(e), according to OPM, is not a "computation" within the meaning of subsection (p).

We disagree with OPM's conclusion for several reasons. Initially, we note that the title of section 8339 is "Computation of Annuity," suggesting that all of its provisions, subsection (e) included, are "computations." Consistent with its title, other provisions of section 8339 refer generally to subsection (e) as an annuity computation. *See, e.g.,* 5 U.S.C. § 8339(f) ("The annuity computed under subsections (a) through (e)...."). The remainder of section 8339, therefore, views subsection (e)—which consists of both the formula for calculating annuity benefits provided in section 8339(a) and the 50% minimum limitation—as an independent annuity computation. The language of the statute simply does not reflect the precision that OPM's argument requires to succeed.

Moreover, the position adopted by OPM in its regulation and urged on appeal requires us to construe the term "average pay" in section 8339(a) as the average *rate* of pay as provided by subsection (p), while reading the same term in section 8339(e) as the actual pay *received*. Naturally,

OPM has an uphill climb to persuade us that such an interpretation is correct. *See Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)). While the rule is not rigid, and a single word may vary in meaning where necessary to meet the purpose of a law, *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001), the purpose of section 8339(p) as evidenced by the legislative history is best served by applying its provisions broadly. OPM, therefore, has not demonstrated that we should deviate from the general rule. *See also General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 124 S.Ct. 1236, 1245, 157 L.Ed.2d 1094 (2004).

### III. CONCLUSION

To agree with OPM, we would need to accept that, in attempting to close a loophole in the annuity statutes, Congress instead intended to preserve that very loophole—but only for air traffic controllers. The language of subsection (p) is clear and its unambiguous meaning is confirmed by the congressional purpose underlying the provision as reflected in its legislative history. We conclude that Congress has directly addressed the question at issue in a manner inconsistent with the position taken by OPM. The decision of the Board is accordingly

*REVERSED and REMANDED.*

### IV. COSTS

Costs to petitioner.