## CHARLESS & BLOW *v.* LAMBERSON.

To constitute a homestead, under the act entitled "An act to exempt a homestead from forced sale," approved January 15, 1849, there must have been, not only ownership, but occupation, both concurring during the existence of that law.

By the term "occupied," as used in the statute, is meant something more than what is known in law as a constructive possession, as contradistinguished from actual possession.

It also means, more than such possession as arises where land is cultivated, or being fenced and improved.

The meaning is fully and correctly expressed in the Code, where it is defined as "the house used as a home."

To be the homestead, the premises must be "used," and used for the purposes designed by the law, to wit: as a *home*—a place to abide—a place for the

family; and when thus used and occupied, it becomes the homestead, and not before.

While statutes granting exemptions should receive such construction as will carry out the liberal and benevolent policy of the legislature, yet parties must bring themselves within their provisions, at least in spirit, before they can claim exemption under them.

The Code went into effect, on the first day of July, 1851, and not at the time of its passage, or approval.

The words, "prior to the passage of this law," in section 1249 of the Code, amount to the same thing, as if the legislature had used the word, "heretofore," and either must relate to the time of taking effect, and not to the passage of the Code.

Where the defendant, in 1848, purchased the premises in controversy; in the spring of 1851, commenced a building thereon; and on the 9th of July following, moved into said building, and continued to reside therein; and where, on the 3d of February, 1852, the plaintiff recovered a judgment against the defendant, on a contract made in April, 1851, issued execution, under which he purchased the property, and obtained a sheriff's deed, in 1853; *Held*, 1. That the defendant, not having occupied the premises while the act of 1849, in relation to homesteads, was in force, the said premises were not exempt from forced sale, as a homestead, under that act. 2. That the contract, on which judgment was rendered, having been made prior to the Code taking effect, the premises were not exempt, ·as a homestead, under the Code.

## *Appeal from the Lee District Court.*

THIS was an action of right for lot No. 5, in block 36, in the city of Keokuk, brought by appellants against appellee. All of the testimony is preserved in a bill of exceptions. From this, it appears, that on the 3d of February, A. D. 1852, the plaintiff recovered a judgment in the Lee county District Court, on a contract, made in April, 1851. The defendant purchased the premises in dispute, in 1848, and in the spring of 1851, commenced building a residence thereon, the said lot being vacant until that time. On the 7th of July, 1851, the defendant moved into said building, and has continued to reside therein, and occupy the same, as his home, to the time of bringing this suit. On the 3d of May, A. D. 1852, an execution, issued on said judgment of plaintiffs, was levied upon this lot, which was sold, purchased by plaintiffs, and in 1853, they obtained a sheriff's deed therefor. The defendant also introduced testimony,

Charless & Blow v. Lamberson.

tending to show, that at the time of this purchase of said property, he ultimately intended to build on the same, as his residence; and that up to the time of his moving into said building, defendant lived in rented property. On these facts, the court below instructed the jury, that before the defendant could defeat the plaintiffs' action, upon the ground that the property was exempt as a "homestead," three things must concur: "1st. That the debt upon which the judgment was rendered, under which the property was sold, was contracted subsequent to July 4, 1849; 2d. That the defendant had actual possession and occupancy of it, at the time of the rendition of said judgment, and the levy upon it, by the execution, under which the plaintiff claims; 3d. That at the time of said judgment and levy, said property was not worth more than five hundred dollars;" to which rulings the plaintiffs excepted. The court also refused the following instructions, asked by the plaintiffs: "That if they find from the evidence, that the contract was made before July, 1851, and the property was not actually occupied and used as a home, by defendant, until after the 3d day of July, 1851; that then defendant cannot claim and own, as a homestead, under the laws of the state."

The jury having returned a verdict in favor of defendant, the usual motion for a new trial was made and overruled, and judgment entered on the verdict. Plaintiffs now appeal.

*Claggett & Dixon*, for the appellants.

*Moss & Marshall*, for the appellee.

WRIGHT, C. J.—Several errors are assigned, upon which we are asked to reverse this judgment; but they all involve the construction of the Homestead Act of 1849, and so much of the Code as relates to the same subject.

The first section of the act of 15th of January, 1849, entitled "An act to exempt a homestead from forced sale," provides as follows: "That a homestead, consisting of any quantity of land not exceeding forty acres, used for agricul-

tural purposes, and the dwelling-house thereon, and its appurtenances, to be selected by the owner thereof, and not included in any recorded town plat, or city, or village; or, instead thereof, at the option of the owner, a quantity of land, not exceeding in amount one-fourth of an acre, being within a recorded town plat, or city, or village, and the dwelling-house thereon, and its appurtenances, owned and occupied by any resident of the state, shall not be subject to forced sale, on execution or any other final process from a court, for any debt or liability, contracted after the fourth day of July, in the year 1849; *Provided*, That the value of such exempted homestead, or town lot and dwelling thereon, shall in no case exceed the sum of five hundred dollars."

The first question for our determination is, whether the property was exempt from execution under the above recited statute? In order to be so exempt, the contract must have been made after the fourth of July, 1849. It was so made, and, therefore, so far the property was not liable. By the law, the extent of it is also limited; but as it is not pretended that the lot in controversy exceeded the quantity allowed, no question arises on that part of the law. The homestead must also be "owned and occupied," and here is the point of controversy between the parties. The plaintiff claims that the homestead must have been owned and occupied at the time of the making of the contract, and that ownership at the time, and subsequent occupancy, will not exempt it; but that if this is not true, there must, at least, have been the concurrence of both before the Code took effect, and the law of 1849 became inoperative. The defendant claims, that the contract being made under the law of 1849, entitled him to claim the exemption, without reference to the time of occupation, provided he so occupied the premises at the time of judgment, levy, or either. Taking it for granted, for the present, that there was no occupation until the defendant moved into the premises, on the 7th of July, 1851, had he acquired a homestead, so as to claim it as exempt under the law of 1849? And this question, we feel constrained to answer in the negative. To constitute a homestead, there

Charless & Blow v. Lamberson.

must have been, in our opinion, not only ownership, but occupation, both concurring, during the existence of that law.

The first law of our state (then territory), that looked to the qualified exemption of a homestead, was passed January 25, 1839.   By that law, the homestead is spoken of as "the messuage, lands or tenements on which such defendant or defendants may be chiefly situated."   This qualified exemption was continued by the law of 1843, that statute having the same descriptive language as above quoted from the law of 1839.   These were succeeded by the law of 1849.   It will be observed that the statute of 1839, followed by the low of 1843, contemplates occupation—the being "chiefly situated" on the land—as essential to give the party the qualified exemption.   Under the law of 1849, however, the word "occupied," is substituted for the words "chiefly situated," and in legal acceptation may be regarded, as alike restrictive.   By the Code, it must "embrace the house used as a home."   Occupation, then, whether spoken of as the lands where defendant is "chiefly situated," or as "the house used as a home," would appear to have been, by all our legislation on this subject, essential to constitute a homestead.   With the policy of the requirement, we have nothing to do; such considerations being addressed alone to the law making power.   If we had, we can see many and controlling reasons for it.   The law is based upon the idea, that as a matter of public policy, for the promotion of the property of the state, and to render independent and above want, each citizen of the government, it is proper he should have a home—a homestead—where his family may be sheltered and live beyond the reach of financial misfortune, and the demands of creditors, who have given credit under such law. If such house is not to be occupied, and need not be, in order to give the exemption, then the reason of the law entirely ceases.   That he may claim as exempt, lands and houses, and yet not occupy them as a home, will not do, because the reason of their exemption is, that he may have such as he has selected, by residence, and what are regarded as neces-

sary for the happiness and well being of the family. To say, that he owns the land, and designs in time to build his residence thereon, will not do; for this would be to leave that indefinite and uncertain, which, by requiring occupation, becomes definite; and would also enable a party to claim an exemption based upon an intention to build, which may never become consummated, to say nothing of the frauds that might thus be perpetrated upon creditors, and even a forcible impairing of contracts made.

It is claimed, however, that while the defendant did not take actual possession of the premises until July 7th, 1851, yet, as he commenced improving the premises in the spring previous, and continued such improvements up to the time of moving into the house, that, therefore, he occupied them, within the meaning of the law, from the time of the commencement of such improvement. What we have already said, however, sufficiently indicates that we could not so hold. By "occupied," as here used, we think is meant something more than what is known in law as a constructive possession—as contradistinguished from actual possession. The owner of the fee is said to be possessed of it, though he may never have occupied it, or made improvements thereon. This, in the absence of actual possession, is the possession which all have of their lands. We think it, also, means more than such possession, as arises where land is cultivated or being fenced and improved. And without seeking elsewhere, we think the meaning is fully and correctly expressed in the Code, where it is defined as "the house used as a home." To be the homestead, it must be "used," and used for the purpose designed by the law, to wit: as a *home*—a place to abide in—a place for the family. When it is thus used and occupied, it becomes the homestead, and not before. To hold otherwise, would be to enable parties to build houses, professedly to be used as a homestead, and when levied upon to satisfy their debts before occupation, give them the privilege of exemption, when in fact, they might afterwards convert them to other uses, and thus make the law an instrument of fraud, instead of protection. It may

be said, however, that in this case the intention formed in the spring of 1851, was actually carried out, by moving into the house in July afterwards, and that before judgment. This is true, but at that time the law of 1849 was repealed. There was ownership, but not occupation under that law, and if the exemption is to be claimed by virtue of it, we think that both should concur. To illustrate: suppose that a judgment had been obtained on the contract before the taking effect of the Code, and execution had issued thereon, can there be any doubt, but this property would have been liable. It appears to us clearly not. The language of the law is clear. It is that a homestead, consisting of a certain quantity of land, and the dwelling-house thereon, and its appurtenances, *owned and occupied*, shall not be subject to forced sale. How could an officer under such an execution, or a purchaser at such sale, know what the owner designed in the future to do with reference to its occupation? The law did not compel him to have such homestead, and it was not, therefore, so far, a legal duty, that they could judge in advance, or would be bound to know, that he would appropriate it to that purpose.

If, then, it would not be exempt, if so levied upon, during the existence of the law of 1849, does it change the rule, when it is levied upon afterwards, and after occupation? And here it is proper to remark, that the property was previously liable, to the execution, unless exempted by positive enactment. By this, we mean, that without some special statute, making the exemption, all of the property of the debtor becomes subject to levy. And while these statutes should receive such construction, as to carry out the liberal and benevolent policy of the legislature, yet, it is apprehended, that parties must bring themselves within their provisions, at least in spirit, before they can claim exemption under them. If the law of 1849, required occupation, as well as ownership, in order to constitute the homestead, and entitle the party to exemption; and if it is only by virtue of some such positive law, that he could claim exemption, it would appear to follow as a very clear consequence, that

if he had not such homestead under the law, he cannot claim the benefit of the law. Until he was in a situation to be protected by the law, no right had accrued, or become vested; and when the law was repealed, he stood just as he would though the law had never been enacted. .

The law, then, having been repealed, before the right became perfect, we next come to inquire, whether the Code can assist the defendant's claim, as is insisted in the argument. By the Code, § 1249, it is provided that " it [the homestead] may also be sold on execution for debts contracted prior to the passage of this law, or prior to the purchase of such homestead, &c." Now, if the defendant had perfected his homestead under the law of 1849, the question would have been entirely different from the one here presented. In such case, it might be claimed, that the law of 1849, entered into and became a part of the contract, and that the homestead, perfected under it, could not be made subject by the subsequent law relating to antecedent contracts. See *Bridgman & Reed* v. *Wilcott*, June term, 1853. But, if not perfected, then no right had become vested or secured, and it might well be provided, that the law should have a prospective, and not a retrospective operation. And it will, also, be observed, that the question does not arise, whether the legislature would have the power to exempt the homestead from antecedent contracts; for the language is express, that it is liable for such debts. We think, therefore, that the Code cannot aid the defendant, unless another position, assumed by him, is true. And that, is this; that the Code having been passed or approved, February 5, 1851, and this contract having been made in April afterwards, it was not a debt contracted prior to the passage of the law, but subsequent thereto; and, therefore, the property is exempt under the Code. But this position is certainly untenable. The constitution provides, that "no law of a public nature, shall take effect until the same shall be published and circulated in the several counties of this state, by authority." In accordance with this provision, and to carry it out, the General Assembly that adopted the Code, made a general provision as to when laws should take

effect, after publication and circulation, and when the Code should take effect.   Accordingly, we know that the Code took effect on the first day of July, 1851.   And by section 35 of the Code, "the terms 'heretofore,' and 'hereafter,' as used in the Code, have relation to the time when this statute takes effect."   To say that section 1249, took effect from its passage, would be to violate an express provision of the organic law, as well as the Code itself.   Had it never been published and circulated, it would have been no more the law of the land, than if it had never been passed.   Neither was it the law, so as to affect the rights and property of parties, until it was so published.   The words "prior to the passage," we think, amount to the same thing as if the legislature had used the word "heretofore;" and either must relate to the time of taking effect, and not to the time of passage.   To our minds, it would be a most dangerous doctrine, to say, that parties should be affected by a law, and that rights could grow up, or become impaired by it, before it was published, and circulated, to impart knowledge of its provisions.   This was never intended, and the conclusion is not warranted by the letter, the spirit, nor the context.

These views dispose of this case, without examining the other numerous points made.   To say, according to the instructions of the court below, that if there was occupation of the premises after the repeal of the law, and before judgment and levy, they would be exempt, we cannot think would be correct.   For by that rule, the defendant might own the property under the law of 1849, and if he could one day after its repeal, perfect his homestead by occupying it before judgment, so he could five years after the repeal.   And if occupation is essential, to constitute the right to claim it as exempt, then, we cannot see how that right can be perfected, after the law has been repealed, which was imperfect at the time of the repeal.   This right was inchoate and contingent, and before perfected, the law which extended the privilege or gave the right contingently, was repealed; and whatever was not then perfected, would not be assisted by the subsequent doing of those things which were necessary to confer

the perfect right.    While we do not say, that there must
have been ownership and occupation, or either, at the time
the contract was made, yet we think there must have been
both before the taking effect of the Code.

Judgment reversed and cause remanded.