In re Bruce A. WILSON and Janet K. Wilson, Debtors.

Bruce A. Wilson and Janet K. Wilson, Appellants,

v.

David A. Sergeant, Bankruptcy Trustee, Appellee.

Bankruptcy No. 03–00146 F. No. C03–3079–MWB.

United States District Court, N.D. Iowa, Central Division.

Jan. 27, 2004.

**6**

Charles A. Walker, Fort Dodge, IA, for Debtors.

David A. Sergeant, Fort Dodge, IA, pro se.

**MEMORANDUM OPINION AND ORDER ON PETITION FOR REVIEW OF THE DECISION OF THE BANKRUPTCY COURT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *BACKGROUND* .................................................7

II. *LEGAL ANALYSIS* ...............................................9
 A. *Standard Of Review* .........................................9
 B. *Arguments Of The Parties* ...................................9
 1. *The Wilsons' argument* ...................................9
 2. *The Trustee's response* .................................10

C. Principles Of Statutory Interpretation ........................................12
D. Are Farm Bill Payments Public Assistance Benefits? ....................13
 1. Property in issue ..............................................13
 2. Phrase in issue ...............................................13
 3. Policies in issue .............................................15
 a. General policies behind the Iowa exemption statute ...............15
 b. Policies behind the Farm Bill ....................................16
 4. Resolution ....................................................19

III. CONCLUSION .......................................................21

"The farmer is the only man in our economy who buys everything at retail, sells everything at wholesale, and pays the freight both ways."[1] *John F. Kennedy* (Thirty–Fifth President of the United States)

This appeal from a decision of the United States Bankruptcy Court for the Northern District of Iowa raises a unique question of first impression: Are direct payments under the Farm Security and Rural Investment Act of 2002, Pub.L. 107–171, 116 Stat. 134 (May 13, 2002) ("Farm Bill") exempt under Iowa law as "public assistance benefits"? The debtors assert error in the bankruptcy court's determination that the direct payments they are entitled to under the Farm Bill for their 2002 farming activities are not exempt as "public assistance benefits." Specifically, the debtors contend that the Farm Bill's purpose of providing a safety net to farmers places payments made under the Farm Bill squarely within the parameters of a "public assistance benefit." The debtors also challenge the bankruptcy court's interpretation of the Iowa exemption statute to require that government aid payments satisfy a "means test" before they can be classified as "public assistance benefits." The Trustee asserts that as Farm Bill payments amount to a commercial recovery program and are not tailored to the impoverishment of the recipient they are of a different nature than those government aid payments the Iowa legislature intended to exempt as "public assistance benefits."

## I. BACKGROUND

Debtors Bruce A. Wilson and Janet K. Wilson ("Wilsons") filed a voluntary petition under Chapter 7 of the Bankruptcy Code on January 17, 2003. David A. Sergeant was appointed as bankruptcy trustee. Among the items listed on their schedule of personal property was "Farm Service Agency, Government Payments under Farm Programs." The Wilsons noted that the amounts of such payments would "not be determined until 06–01–2003." The Wilsons claimed the property was exempt under Iowa Code § 627.6(8)(a), which exempts from bankruptcy proceedings any property that constitutes "[a] social security benefit, unemployment compensation, or any public assistance benefit." On March 31, 2003 the Trustee filed an objection to this exemption on the ground that the farm program payments did not qualify for exemption under Iowa Code § 627.6(8)(a). The Wilsons resisted the objection on April 29, 2003. In a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) the bankruptcy court held a hearing on the objection to exemption on July 10, 2003 in Fort Dodge, Iowa.

Following the hearing, the bankruptcy court entered a decision sustaining the Trustee's objection on July 29, 2003. In

---

1. Quotation found at *http://www.nonstopengl- ish.com/reading/quotations.*

the July 29, 2003 order, the bankruptcy court made the following findings of fact of interest here. The "Government Payments under Farm Programs" that the Wilsons claimed were exempt were payments made pursuant to the "Farm Security and Rural Investment Act of 2002," Pub.L. No. 107–171, 116 Stat. 134 (May 13, 2002) ("Farm Bill"). The Farm Bill provides for both "direct and counter-cyclical payments," but the Wilsons qualified to receive "direct payments" only. The Wilsons entitlement to these payments was based solely on their crop farming in 2002. Direct payments, pursuant to the Farm Bill are made at a rate of $0.28 per bushel for corn and $0.44 per bushel for soybeans. 7 U.S.C. § 7913(b). The total payments made to an individual in a year cannot exceed $40,000.00. The bankruptcy court found that for the program years 2003 through 2007, an individual is ineligible for payments under the Farm Bill if their adjusted gross income exceeds $2.5 million for the three tax years immediately preceding the applicable program year. Further, the court noted that for the tax years 1996 through 2001 the Wilsons have received, and reported as taxable income, $405,834.00 in farm program payments.

In determining the merits of the Trustee's objection, the bankruptcy court focused on the rulings in *In re Gibbs*, No. 99–02769S (Bankr.N.D.Iowa May 10, 2000) and *Matter of Longstreet*, 246 B.R. 611 (Bankr.S.D.Iowa Feb.28, 2000)—both of which dealt with why earned income credits ("EIC") constituted "public assistance benefits" under Iowa Code § 627.6(8)(a). After analyzing these cases the bankruptcy court came to the following conclusion:

Wilsons' farm program payments are of an entirely different character (than earned income credits). The act under which the payments will be made is not tailored to provide assistance to needy individuals. Wilsons' 2002 grain operation was apparently the sole basis for qualification for the payments. The amount of the payments is not related to need. The only "means test" for entitlement to payments is an adjusted gross income of less than $2.5 million. The court concludes that the Iowa legislature did not intend the exemption statute to protect Wilsons' farm program payments as "public assistance benefits."

*In re Wilson*, 296 B.R. 810, 813 (Bankr. N.D.Iowa 2003).

On August 19, 2003, the bankruptcy court entered its judgment that the Trustee's objection be sustained, in conformation with the bankruptcy court's July 29, 2003 order. The Wilsons filed a timely notice of appeal on August 20, 2003. On September 3, 2003, the Wilsons filed their designation of record and statement of issues presented on appeal, which identified the following issue for appeal:

Did the Bankruptcy Judge err in ruling that the Iowa Legislature did not intend the exemption statute [Iowa Code § 627.6(8)(a)] to protect the Debtors' farm program payments as "public assistance benefits"?

The Clerk of the Bankruptcy Court filed a Certificate on Appeal on September 9, 2003. Pursuant to Bankruptcy Rule 8009 and N.D. Ia. L.R. 8001.1 concerning bankruptcy appeals, appellants filed their brief on appeal on November 6, 2003,[2] and the Trustee filed his responsive brief on December 31, 2003.[3] The Wilsons opted not

---

**2.** The Wilsons were initially required to file their brief on September 24, 2003—however, they moved for, and were granted, an extension of time to file their brief up to and

including November 6, 2003. (Doc. Nos. 4 & 5).

**3.** The Trustee was to file his responsive brief on November 20, 2003—however, the Trustee

to file a reply brief. Therefore, the Wilsons' appeal is now fully submitted. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) (2003). In this matter the appellants are represented by Charles A. Walker of the Walker Law Office, P.C. in Fort Dodge, Iowa. The appellee is represented by David A. Sergeant, of David A. Sergeant, P.C., in Fort Dodge, Iowa.

## II. LEGAL ANALYSIS

### A. Standard Of Review

■ The Eighth Circuit Court of Appeals has, on a number of occasions, reiterated the applicable standard of review for bankruptcy appeals in the context of the district court's review of a bankruptcy court's conclusions:

> When a district court reviews a bankruptcy court's judgment, it acts as an appellate court. As with most appellate proceedings, the district court may review the bankruptcy court's legal conclusions *de novo*, but the bankruptcy court's findings of fact shall not be set aside unless clearly erroneous. BANKR. R. 8013; *see, e.g., In re Hunter*, 771 F.2d 1126, 1129 n. 3 (8th Cir.1985); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); see also BANKR. R. 7052 (Federal Rule of Civil Procedure 52 applies in adversary bankruptcy proceedings). Furthermore, the district court may not make its own independent factual findings. If the bankruptcy court's factual findings are silent or ambiguous as to an outcome determinative factual question, the district court may not engage in its own factfinding but, instead, must remand the case to the bankruptcy court for the necessary factual determination. *E.g., In re Walker*, 726 F.2d 452, 454–55

(8th Cir.1984); *In re Neis*, 723 F.2d 584, 588–90 (7th Cir.1983).

*Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir.1987); *see, e.g., Gourley v. Usery*, 123 F.3d 1089, 1093 (8th Cir.1997) (reiterating the fact that the bankruptcy court's legal conclusions are reviewed, on appeal, under the *de novo* standard); *First Nat. Bank of Olathe, Kan. v. Pontow*, 111 F.3d 604, (8th Cir.1997) (noting that the bankruptcy court's legal conclusions are reviewed *de novo*, where as its factual findings are reviewed under the clearly erroneous standard); *In re Muncrief*, 900 F.2d 1220, 1224 (8th Cir.1990) ("In reviewing a bankruptcy court's judgment, ordinarily a district court acts as an appellate court; reviewing the bankruptcy court's legal conclusions *de novo*, and its findings of fact under the clearly erroneous standard."). The bankruptcy court's interpretation of a statute is a question of law which is reviewed *de novo*. *In re Martin*, 140 F.3d 806, 807–08 (8th Cir.1998); *In re Pepmeyer*, 273 B.R. 782 (N.D.Iowa 2002) (citing *In re Martin* for the principle that the bankruptcy court's interpretation of a statute is a question of law reviewed *de novo* ).

### B. Arguments Of The Parties

### 1. The Wilsons' argument

In their appellate brief, the Wilsons make several arguments for reversal of the bankruptcy judge's decision, and in support of the Wilsons' contention that this court must instead overrule the Trustee's objection and hold their Farm Bill payments exempt under Iowa Code § 627.6(8)(a). The Wilsons argue that the Farm Bill payments they received qualify as "public assistance benefits" for a number of reasons. First, the Wilsons claim

---

moved for, and was granted, an extension of time in which to file his responsive brief until January 6, 2004. (Doc. Nos. 7 & 8). As the

text states, the Trustee filed his responsive brief on December 31, 2003, before his extended deadline expired.

that the placement of the term "public assistance benefits" with such benefits as unemployment compensation and social security payments—both of which an individual qualifies for based on employment status and not income—leans towards a broad interpretation of the phrase "public assistance benefits" to include payments under the Farm Bill.

Next, the Wilsons support their position by drawing an analogy between cases holding earned-income credits ("EIC") exempt as "public assistance benefits" and the Farm Bill payments at issue. In this regard, the Wilsons rely chiefly on the analysis employed by the Bankruptcy Court for the Southern District of Iowa in *In re Longstreet*, 246 B.R. 611, 614 (Bankr. S.D.Iowa 2000), in determining that an EIC is exempt as a "public assistance benefit." First, the Wilsons draw a parallel between the purpose of the federal EIC program and the Farm Bill payments. The well-established purposes of the federal EIC are:

> to reduce the disincentive to work caused by the imposition of social security taxes on earned income, to stimulate the economy by funneling funds to persons likely to spend the money immediately, and to provide relief for low-income families hurt by rising food and energy prices.

*Sorenson v. Sec'y of Treasury of United States*, 475 U.S. 851, 864, 106 S.Ct. 1600, 1608–09, 89 L.Ed.2d 855 (1986); *see also In re Longstreet*, 246 B.R. at 614 (stating a goal of the EIC is to prevent a family from becoming impoverished). Drawing from the legislative history, the Wilsons assert that the purposes of the Farm Bill are "to strengthen the safety net for agricultural producers," Brief of the Appellants in Support of Appellees' Notice of Appeal to U.S. District Court Order Sustaining Trustee's Objection to Exemptions (Doc. No. 6), at

pg. 11 ("Appellants' Brief") (quoting Senate Bill S1713), to address the "terribly bleak picture for our farm families," Appellants' Brief at 12 (quoting 148 Congressional Record H2022–1, H2023), and to provide a safety net for farmers across the United States. Appellants' Brief at pg. 12 (citing Statement of President George W. Bush, 2002 U.S.C.C.A.N. 410, 410 (2002)). The Wilsons assert that the purposes behind the enactment of the EIC are parallel to those behind the enactment of the Farm Bill, and that therefore, like EICs, Farm Bill payments fall under the definition accorded to "any public assistance benefit" in Iowa Code § 627.6(8)(a).

Finally, the Wilsons take issue with the fact that the bankruptcy court applied an ambiguous test to determine if the Farm Bill was appropriately tailored to assisting needy individuals. The bankruptcy court determined that the Farm Bill, which for eligibility for payments requires only that the farmer has not had an adjusted gross income in excess of $2.5 million dollars over the preceding three years, was not tailored towards needy individuals. *In re Wilson*, 296 B.R. 810, 813 (Bankr. N.D.Iowa 2003). The Wilsons contend that the such a test is not required by *Longstreet* and that the application of this test amounts to impermissible legislating from the bench on the part of the bankruptcy court. Appellants' Brief at pg. 13.

### 2. *The Trustee's response*

The Trustee first attacks the Wilsons' argument by pointing out that the *Longstreet* court held that EICs were public assistance benefits because the "class of persons that Congress intended to benefit by creating the 'Earned Income Credit' Program of 1975 is composed entirely of low income families." Appellee's Brief and Argument (Doc. No. 10) at pg. 7 ("Appellee's Brief") (quoting *Longstreet*, 246 B.R.

at 614). The Trustee asserts that the fact that EICs are directed towards an entire class comprised of low income families is key to the *Longstreet* court's determination that EICs are "public assistance benefits." As the primary purpose of an EIC in benefitting a class of low income persons matches with the plain meaning of "public assistance benefits" assigned by the *Longstreet* court—"government aid to needy, blind, aged or disabled persons and to dependent children"—EIC are properly exempt as "public assistance benefits." *See Longstreet*, 246 B.R. at 615 (quoting MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed.1994)). The Trustee asserts that all "public assistance legislation, whether local, state, or federal is social welfare relief ... whose recipients for eligibility are of a class intended by the particular program i.e. poverty, disability, or some other physical or economic malady." Appellee's Brief at pg. 8 (citation omitted).

The Trustee contends that the purpose of Farm Bill payments are entirely different in nature from those behind the enactment of the EICs. The Trustee asserts that "[t]he primary purpose of the [Farm Bill] is not to provide economic relief to a class composed entirely of low income families ... [but] to benefit a broad range of individuals and businesses who operate (sic) a commercial enterprise of all sizes in the American economy." Appellee's Brief at pg. 9. Because the eligibility criteria for receiving Farm Bill payments is not based on low income, poverty or disability, it can therefore not be classified as a "public assistance benefit" or social welfare program. *Id.* The Trustee further claims that the fact that one of the purposes of the Farm Bill is to provide a "safety net" for farmers establishes that the intended class of recipients of Farm Bill payments is not yet impoverished—thus eliminating Farm Bill payments from contention as "public assistance benefits." Classification of Farm Bill payments as public assistance benefits, according to the Trustee, would further open the door for any payments under any government program to qualify for exempt status as "public assistance benefits"—even if the debtors have significant income and have no trouble paying for their basic needs.

As the Trustee would have it, the placement of the phrase "any public assistance benefits" carries some importance, but not that accorded to it by the Wilsons. The Trustee asserts that a key error in the Wilsons' logic is their reliance on the legislative history of the Farm Bill, rather than on the meaning intended by the Iowa legislature in enacting the exemption statute. The history of the Iowa exemption statute shows that it was originally modeled after the Bankruptcy Reform Act of 1978—as the language of the original Iowa exception statute in 1981 follows an almost verbatim reproduction of the exemptions in the original incarnation of the federal statute at 11 U.S.C. § 522(d)(10) (1978). The legislative history of 11 U.S.C. § 522(d)(10) states that the exemptions are grouped together (i.e. social security benefits, unemployment compensation, veterans' benefits, public assistance benefits, etc.) as they are all "akin to future earnings" and serve as substitutes for lost future income. The Trustee posits that Farm Bill payments are not akin to future earnings because they are "not wages or compensation intended to substitute for lost future earnings so as to support the basic requirements of life.... [but][r]ather the [Farm Bill] is a commercial recovery attributed to past farming practices, operations and production for certain price differentials or as a supplement as proceeds from past crop production." Appellee's Brief at pg. 15. The Farm Bill is further distinguishable as Farm Bill payments can be made to both individuals as well as corporate entities—

12

whereas the types of benefits listed in section 627.6(8)(a) are payable only to individuals. In summary:

Public assistance benefits, as are the other exemptions under this subsection of Iowa Code § 627.6(8), are intended only to include those that are designed for and paid to people and which are to help pay for their basic subsistence needs, not for commercial operations.

Appellee's Brief at pg. 17.

Finally, the Trustee points to the numerous times the phrase "public assistance" has been used in the Iowa Code, in Iowa caselaw and in Federal caselaw for the proposition that the Iowa legislature knew exactly what those words meant when it used the phrase "public assistance benefit" in the exemption statute—and it surely did not intend to include Farm Bill payments. The Wilsons' Farm Bill payments are of an entirely different character than what the Iowa legislature envisioned in using the phrase "public assistance benefits." The Trustee further contends that *Longstreet does require* a candidate public assistance program to be tailored to the needy; in that the benefits of the candidate program must flow to a class composed entirely of low income individuals. As the class of persons that the benefits of Farm Bill payments flows to are not defined by disability, poverty or low income, Farm Bill payments do not constitute "public assistance benefits."

### C. Principles Of Statutory Interpretation

 Where the meaning of the statutory phrase in question is not defined by statute the court must engage in statutory interpretation.

When the text of the statute is plain and its meaning clear, we do not search for a meaning beyond the statute's express terms or resort to rules of statutory construction. *Henriksen v. Younglove Const.*, 540 N.W.2d 254, 258 (Iowa 1995). It is only when there is ambiguity in the statute that we resort to such rules. *Stroup v. Reno*, 530 N.W.2d 441, 443 (Iowa 1995). We consider a statute ambiguous if reasonable minds could differ or be uncertain as to the meaning of it. *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996).

Our ultimate goal in construing statutes is to find the true intention of the legislature. *Bernau v. Iowa Dep't of Transp.*, 580 N.W.2d 757, 761 (Iowa 1998). If more than one statute is relevant, we consider the statutes together and try to harmonize them. *State v. Snyder*, 634 N.W.2d 613, 615 (Iowa 2001).

The legislature is its own lexicographer. *Iowa Beef Processors, Inc. v. Miller*, 312 N.W.2d 530, 533 (Iowa 1981). So in searching for legislative intent, we are bound by what the legislature said, not by what it should or might have said. *Krull v. Thermogas Co.*, 522 N.W.2d 607, 612 (Iowa 1994). Additionally, we are bound to follow the legislature's definitions and "may not add words or change terms under the guise of judicial construction." *Iowa Beef Processors*, 312 N.W.2d at 532. If the legislature has not defined words of a statute, we may refer to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage. *Bernau*, 580 N.W.2d at 761.

*Iowa Dept. of Transp. v. Soward*, 650 N.W.2d 569, 571 (Iowa 2002); *see also Am. Legion, Hanford Post 5 v. Cedar Rapids Bd. of Review*, 646 N.W.2d 433, 437–38 (Iowa 2002) (citing principles of statutory construction and using Black's Law Dictionary to determine meaning of phrase in question). The meaning of statutory language is ascertained by "consider[ing] the

context of the provision at issue and ... interpret[ing] it in a manner consistent with the statute as an integrated whole." *Griffin Pipe Prods. Co. v. Guarino,* 663 N.W.2d 862, 864 (Iowa 2003); *see In re Martin,* 140 F.3d at 807 ("[W]hen interpreting a statute, [the reviewing court] looks to its express language and overall purpose.").

 It is well settled that Iowa's exemption statute is construed liberally in favor of the debtor—though the court must be "careful not to depart substantially from the express language of the exemption statute or to extend the legislative grant." *In re Longstreet,* 246 B.R. 611, 614 (Bankr.S.D.Iowa 2000); *see also In re Honomichl,* 82 B.R. 92, 93 (Bankr. S.D.Iowa 1987); *Matter of Hahn,* 5 B.R. 242, 244 (Bankr.S.D.Iowa 1980); *Frudden Lumber Co. v. Clifton,* 183 N.W.2d 201, 203 (Iowa 1971). With these principles of statutory interpretation in mind the court now turns to the task of determining whether the Iowa legislature intended Farm Bill payments to fall under the phrase "any public assistance benefits."

### D. Are Farm Bill Payments Public Assistance Benefits?

#### 1. Property in issue

The Farm Security and Rural Investment Act, Pub.L. 107–171, 116 Stat. 134 (May 13, 2002) ("Farm Bill") was enacted into law on May 13, 2002. Title I, codified at 7 U.S.C. § 7901, *et seq.,* authorizes both direct and counter-cyclical payments to producers of qualified commodities. Only direct payments are at issue in this appeal. Pursuant to the Farm Bill direct payments are made to producers of covered commodities that establish the requisite payment yields and base acres. 7 U.S.C. § 7913(a). Base acres and payment yields are established pursuant to 7 U.S.C. §§ 7911, 7912. The two covered commodities at issue here are corn and soybeans the rates of which are $0.28 per bushel for corn and $0.44 per bushel for soybeans. 7 U.S.C. § 7913(b). The total direct payments made to an individual who farms covered commodities cannot exceed $40,000.00 for each farm year. 7 U.S.C. § 1308(b)(1). To be eligible for payments in program years 2003 through 2007 an individual must either: (1) have an average adjusted gross income of less than $2.5 million for the three tax years immediately preceding the applicable program year; or (2) have not less than 75% of their average adjusted gross income derived from farming, ranching or forestry operations for the three tax years immediately preceding the applicable program year. 7 C.F.R. § 1400.600(a) & (b) (2003). Under the Farm Bill the Wilsons qualified for direct payments based on their crop farming of corn and soybeans in 2002. It is agreed that the Wilsons need not farm in 2003 in order to be eligible for these payments. At the time of the bankruptcy court's decision, the Wilsons' estimated Farm Bill payments for 2002 were $16,570.00. The Trustee asserts that he has so far received $16,554.00 in direct program payments under the Farm Bill.[4] Appellee's Brief and Argument, Doc. No. 10, pg. 3 n. 1.

#### 2. Phrase in issue

Under Chapter 7 of the Bankruptcy Code, debtors are entitled to exempt cer-

---

4. From the record it appears undisputed that the Wilsons received a total of $405,834.00 in farm program payments for tax years 1996 through 2001—which the Wilsons reported as taxable income. However, the only issue on appeal is whether the Wilsons' Farm Bill payments for 2002 are exempt from bankruptcy proceedings. As the Farm Bill was not enacted until 2002, the farm program payments the Wilsons received in tax years 1996 through 2001 are not payments under the Farm Bill, but rather farm program payments under the Farm Bill's predecessor—therefore these payments have no relevance in this analysis.

tain types of property from bankruptcy proceedings. *See* 11 U.S.C. § 522. A default list of debtor exemptions is listed in Bankruptcy Code § 522(d)(10). However, Congress saw fit to give each state the authority to override the federal exemptions allowed in 11 U.S.C. § 522. *See id.* § 522(b)(1) (allowing the debtor to exempt "property that is specified under subsection (d) of this section, *unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize . . .*"). Iowa is one such state that has exercised its authority to opt-out of the federal exemptions:

> A debtor to whom the law of this state applies on the date of filing of a petition in bankruptcy is not entitled to elect to exempt from property of the bankruptcy estate the property that is specified in 11 U.S.C. sec. 522(d) (1979). This section is enacted for the purpose set forth in 11 U.S.C. sec. 522(b)(1) (1979).

Iowa Code § 627.10 (2003); *see In re Kemmerer,* 251 B.R. 50, 51 (8th Cir. BAP 2000) (recognizing that Iowa has opted out of the exemptions in 11 U.S.C. § 522(d)); *In re Sears,* 246 B.R. 881 (Bankr.S.D.Iowa 2000) (noting that Iowa has opted out of the federal exemption scheme). Therefore, the Wilsons, as Iowa residents at the time of filing their Chapter 7 petition for bankruptcy, are limited to the exemptions recognized by Iowa law and non-bankruptcy federal laws.

The exemption provision at issue in this appeal is housed in Iowa Code § 627.6(8)(a), which exempts from bankruptcy:

> 8. The debtor's rights in:
>
> a. A social security benefit, unemployment compensation, or *any public assistance benefit. . . .*

Iowa Code § 627.6(8)(a). Prior to May 17, 1999, this provision of the Iowa Code used

to exempt "*a local* public assistance benefit." Presumably in response to Iowa bankruptcy courts' early determinations that earned-income credits ("EIC") could not be exempt as "local" public assistance benefits under section 627.6(8)(a), *see, e.g., In re Crouch,* No. 96–23085–D, (Bankr. N.D.Iowa May 13, 1997) (finding EIC could not be construed to be a "local" public assistance benefit), the Iowa legislature amended this phrase to allow an exemption for "any" public assistance benefits. H.F. 660, 1999 Leg., 78th Sess. (Iowa 1999). The phrase "any public assistance benefit" is not defined in Iowa's exemption statute.

As mentioned above, where a term or phrase is not statutorily defined the principles of statutory construction allow the presiding court to look to interpretations given to the terminology in prior court decisions. In the case of *In re Longstreet,* 246 B.R. 611 (Bankr.S.D.Iowa 2000) the United States Bankruptcy Court for the Southern District of Iowa defined the phrase "public assistance benefit" by its plain meaning:

> "Public assistance benefit" is not a technical phrase, and it has not acquired a peculiar and appropriate meaning in law. Neither the Iowa exemption statute nor the case law interpreting it define the term in a unique fashion. Black's Law Dictionary (7th ed.1999) does not define "public assistance" or "public assistance benefit." A plain reading of § 627.6(8)(a) suggests the phrase should be construed according to the context of the statute and its common meaning.
>
> Merriam Webster's Collegiate Dictionary (10th ed.1994) defines "public assistance" as "government aid to needy, blind, aged, or disabled persons and to dependent children." The modifier "any" makes the scope of "public assis-

tance benefit" quite broad. The term appears in conjunction with "[a] social security benefit" and "unemployment compensation." Thus, in context of the Iowa exemption statute and according to its common meaning, "public assistance benefit" includes [earned-income credits]."

*Id.* at 614–615. It is clear from prior decisions of Iowa courts, as well as other courts interpreting the same phrase, that EIC falls under the definition accorded to the phrase" any public assistance benefit." *Id.; accord In re Brasher,* 253 B.R. 484, 486 (M.D.Ala.2000) ("bankruptcy courts construing . . . state-law exemptions [for public assistance] have been essentially unanimous in finding the earned-income credit to be exempt. . . ."); *Flanery v. Mathison,* 289 B.R. 624, 629 (W.D.Ky.2003) (holding that EIC "is a public assistance grant used to combat poverty" and is therefore exempt under Kentucky statute exempting public assistance benefits from bankruptcy); *In re Fish,* 224 B.R. 82, 84–85 (Bankr.S.D.Ill.1998) (finding earned income credit exempt under statutory exemption for "public assistance"); *In re Brockhouse,* 220 B.R. 623 (Bankr.C.D.Ill. 1998) (holding EIC exempt under Illinois' statutory exemption for "public assistance benefits"); *In re Jones,* 107 B.R. 751, 752 (Bankr.D.Idaho 1989) (finding federal earned income credit exempt under statutory language exempting "public assistance legislation"). The court adopts the plain meaning accorded to "public assistance benefits" by the *Longstreet* court— "government aid to needy, blind, aged, or disabled persons and to dependent children." *Longstreet,* 246 B.R. at 614.

Further, as the original Iowa exemption statute enacted in 1981 was modeled after[5]

the federal bankruptcy exemption statute, 11 U.S.C. § 522(d)(10) (1978), the legislative history of the federal statute can be helpful in deriving the Iowa legislature's intent in exempting public assistance benefits. *In re Buchholz,* 144 B.R. 443 (Bankr. N.D.Iowa 1992). The legislative history of the federal bankruptcy provisions indicates that all of the benefits exempted under 11 U.S.C. § 522(d)(10) are grouped together as they are "akin to future earnings of the debtor." Bankruptcy Reform Act of 1978, H.R. REP. No. 95–595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6318. However, it is noteworthy that while the Iowa exemption statute, unlike the federal bankruptcy provision, was amended in 1999 to exempt not just a "local" public assistance benefit, but "any" public assistance benefit—the federal statute has not been since amended to include this broadening modifier. *Compare* IOWA CODE § 627.6(8)(a) ("any public assistance benefit") *with* 11 U.S.C. § 522(d)(10)(A) ("a local public assistance benefit").

### 3. Policies in issue

#### a. General policies behind the Iowa exemption statute

There are five basic purposes for exemption statutes:

1. To provide a debtor enough money to survive.

2. To protect his dignity and his cultural and religious identity.

3. To afford a means of financial rehabilitation.

4. To protect the family unit from impoverishment.

---

5. Indeed, the language of the exemptions contained in the Bankruptcy Reform Act, 11 U.S.C. § 522(d)(10) (1978) is identical to the

1981 enactment of the Iowa exemption statute.

5. To spread the burden of the debtor's support from society to his creditors.[6]

*In re Hahn*, 5 B.R. 242, 244 (Bankr. S.D.Iowa 1980) (quoting Resnich, *Prudent Planning or Fraudulent Transfer? The Use of Nonexempt Assets to Purchase or Improve Exempt Property on the Eve of Bankruptcy*, 31 RUTGERS L. REV. 615, 621 (1978)); *see also In re Pettit*, 55 B.R. 394, 397 (Bankr.S.D.Iowa 1985) ("The object of exemption statutes is to protect debtors and their families from the deprivation of those things 'essential for their education, culture, and spiritual upbuilding.'") (quoting *Dunbar v. Spratt–Snyder Co.*, 208 Iowa 490, 226 N.W. 22 (Iowa 1929)); 1990 Iowa Op. Att'y. Gen. 66 (1990) (citing *Hahn* for the principle that the exemption statute "provide[s] a means of financial rehabilitation to the debtor by spreading the burden of his support from society to his creditors."). "Iowa's exemption statutes are based on public policy to render each citizen independent and above want, shelter for a man and his family safe from abject poverty and beyond the reach of creditors who could turn them into beggars." *Id.* (citing *Charless v. Lamberson*, 1 Iowa 435 (1855)). It has been said that the task of Iowa's exemption statute is to "protect the family from impoverishment." *In re Davis*, 136 B.R. 203, 207 (Bankr. S.D.Iowa 1991).

### b. Policies behind the Farm Bill

The court acknowledges, and both the Wilsons and the Trustee recognize, that the policies behind the Farm Bill are many and varied:

To strengthen the safety net for agricultural producers, to enhance resource conservation and rural development, to provide for farm credit, agricultural research, nutrition, and related programs, to ensure consumers abundant food and fiber, and for other purposes.

S. 1731, 107th Cong. (2001) (enacted). The fact that the Farm Bill contains ten separate Titles evinces the fact that it touches on a myriad of different issues, some of which include: commodity programs, conservation, trade, nutrition programs, credit and loan programs for farmers, rural development, agricultural research, forestry and energy, among others. *Id.* The payments that the Wilsons received were under Title I of the Farm Bill, which deals with commodity programs. 7 U.S.C. § 7901, *et seq.* It is far from unusual for Congress to adopt an act which contains a multitude of purposes—in fact, this court would pontificate that many acts of Congress are intended to fulfill more than one purpose. *See, e.g.*, Fair and Accurate Credit Transactions Act of 2003, Pub.L. 108–159, 117 Stat.1952 (Jan. 7, 2003) ("An Act to amend the Fair Credit Reporting Act, to prevent identity theft, to improve resolution of consumer disputes, improve accuracy of consumer records, make improvements in the use of, and consumer access to, credit information, and for other purposes."); Health Professions Education Partnerships Act of 1998, Pub.L. 105–392, 112 Stat. 3524 (Nov. 13, 1998) ("An act to amend the Public Health Service Act to consolidate and reauthorize health professions and minority and disadvantaged health education programs, and for other purposes."); Pub.L. 101–302, 104 Stat. 213 (May 25, 1990) ("An Act making dire emergency supplemental appropriations for disaster assistance, food stamps, unemployment compensation administration, and other urgent needs, and transfers, and re-

---

**6.** This final purpose explicitly rebuts the Trustee's argument that Farm Bill payments should not qualify for exemption under § 627.6(8)(a) because creditors should not shoulder the burden of the Wilsons' bankruptcy.

ducing funds budgeted for military spending for the fiscal year ending September 30, 1990, and for other purposes."); G.I. Bill Improvement Act of 1977, Pub.L. 95–202 (Nov. 23, 1977) ("An Act ... to increase the rates of vocational rehabilitation, educational assistance, and special training allowance paid to eligible veterans and persons, to make improvements in the educational assistance programs, and for other purposes."). Much to the chagrin of the Trustee, the fact that the Farm Bill has many purposes does not alone prevent the Wilsons' Farm Bill payments from classification as public assistance benefits. Other than the commodity programs in Title I, the only other monetary assistance the plan grants to farmers is contained in Title V which provides for situations in which farmers would qualify for special government loans and Title X which allows for crop insurance and disaster assistance—neither of which are applicable to this matter. It is quite clear from a reading of the Farm Bill that the objective of assisting farmers expressed in the Presidential statements and legislative history correlates directly to the commodity program payments established in Title I, and *only* to such payments. *See* 5 WEST'S FED. ADMIN. PRAC. § 5501 (3d ed.) ("Domestic commodity programs are primarily intended to promote the economic welfare of producers of certain agricultural commodities."). Therefore, the court will only discuss the legislative history insofar as it refers to the commodity program payments under Title I—specifically the goal of the Farm Bill in providing financial assistance to farmers.

On May 13, 2002, when President Bush signed the bill into law, he issued the following statement:

... I know how hard many [farmers] struggle. Their livelihood depends on things they cannot control, the weather, crop disease, uncertain pricing. They

need a farm bill that provides support and help when times are tough. And that is why I'm signing this bill today. This bill is generous and will provide a safety net for farmers. . . .

Statement by President George W. Bush Upon Signing H.R. 2646, 2002 WL 1751399, 2002 U.S.C.C.A.N. 410 (May 13, 2002); *see also* Statement on Signing the Farm Security and Rural Investment Act of 2002, 2002 WL 1758355, 2002 U.S.C.C.A.N. 413 (May 13, 2002) ("This Act will provide a safety net for America's farmers, who feed America and much of the world."). Further, when the Farm Bill was up for consideration in the House of Representatives, the following statements were made regarding the objective of the Farm Bill as it pertains to assisting farmers through commodity program payments:

● "The bill restores a safety net for our Nation's farmers and sends a signal to them as they head into the fields this spring that we stand committed to family farmers as the primary element of the production of our Nation's food supply. The bill restores a safety net for our Nation's farmers when prices collapse. No critical aspect of Freedom to Farm so failed our farmers as the failure to have a safety net price response. This bill makes that right." 148 Cong. Rec. H2022–01, H2027–28 (statement of Congressman Pomeroy, North Dakota).

● "In contrast [to the Freedom to Farm Act], this year's farm bill provides a meaningful safety net for America's agriculture producers and gives certainty and support to farmers who might otherwise be forced to leave farming." 148 Cong. Rec. H2022–01, H2028 (statement of Congressman Skelton, Missouri).

- "[T]here are 2 things we take for granted in this country every single day. One is cheap food and the other, I think, is even more important, and that is an unlimited supply of young farmers who are willing to go out there and take a chance at it. We take that for granted every day. I think part of the reason we ought to pass this bill today is because we need to send a message to younger farmers that when we do things here at the Federal level that make it difficult for farmers to compete in the world marketplace, we ought to be there to provide a shock absorber, and when we send that message, we are going to have those young farmers out there willing to take a chance at it." 148 Cong. Rec. H2022–01, H2029 (statement of Congressman Gutknecht, Minnesota)

- "[T]he U.S. farm economy continues to experience one of the worst cycles of depressed prices for most of the major commodities, while the costs continue to escalate for major inputs. Our farmers and ranchers have been without a safety net to protect them during periods of low market prices. Fortunately, we are about to change that with this new farm bill. . . . I am confident the safety net provided to producers by this bill will insure they remain competitive and viable, even in times of depressed prices. . . . I believe we have produced a bill that will benefit all farmers, ranchers, and rural communities across America." 148 Cong. Rec. H2022–01, H2034 (statement of Congressman Everett, Alabama).

- "[T]hose of us that represent farm districts in America know this is the fifth straight year of record low prices, record high costs of production. We know that real net farm income is at its lowest since the Great Depression, and we know that American agriculture is competing in a global economy where our trading partners are subsidizing their farmers at considerably more than our country does before this bill." 148 Cong. Rec. H2022–01, H2036 (statement of Congressman Pence, Indiana).

- "This agreement provides a strong safety net for our Nation's family farmers as well as for the small and disadvantaged farmers." 148 Cong. Rec. H2022–01, H2041 (statement of Congressman Bishop, Georgia).

- "The overall package placed before us today is an improvement over the status quo when it comes to the support and safety net the Iowa farmers have requested. . . . the Farm Security Act provides the support and safety net that Iowa farmers have asked for." 148 Cong. Rec. H2022–01, H2049 (statement of Congressman Nussle, Iowa).

- "There's no doubt that times are tough in farm country. The ag economy continues to suffer the burden of low market prices and rising costs of production, and producers, already squeezed by narrow profit margins, pay the price. . . . Our farmers and rural communities need help to survive, and looking at the farm economy over the past 20 years tells us why. . . . [I]t should not come to us as a surprise when farmers turn to us in desperate times. . . . If we don't act now, next year may be too late for some family farms." 148 Cong. Rec. H2022–01, H2051 (statement of Congressman Moran, Kansas).

It is clear from these brief excerpts that when the Farm Bill was enacted, the intent of Congress, at least in part, was to provide a financial "safety net" for farmers

from fluctuating commodity prices, to preserve the lifestyle of family farmers and their communities, and to protect small, disadvantaged farmers from impoverishment during times of depressed market prices.

### 4. Resolution

The Trustee argues that for payments to amount to public assistance, the enacting legislation must constitute social welfare relief. However, it is not necessary that Congress intended Farm Bill payments as a "welfare grant" for said payments to constitute public assistance benefits under section 627.6(8)(a). *In re Gibbs*, No. 99–02769S, (Bankr.N.D.Iowa May 10, 2000). "The exemption provided by § 627.6(8)(a) is not so limited. There are a number of ways of providing assistance to needy families." *Id.* From the Trustee's perspective, the Iowa exemption statute, in effect, reads that a debtor may exempt "[a] social security benefit, unemployment compensation and [federal earned-income credits]." *See* IOWA CODE § 627.6(8)(a). However this is explicitly not the case—the exemption is not limited to only EIC or programs that constitute social welfare legislation. To limit the exemption statute in such a way would do great injustice to the province of the legislature as lexicographer. *See Iowa Dept. of Transp. v. Soward*, 650 N.W.2d 569, 571 (Iowa 2002). Rather than exempt only specific, enumerated benefits, the Iowa legislature chose to exempt "any public assistance benefit."

> The Iowa legislature, by providing an exemption for "any" public assistance benefit, broadened the reach of the statute. This indicates an intent to exempt

payments under all types of programs having the same underlying purpose, *regardless of the vehicle chosen to implement the program.*

*In re Gibbs*, No. 99–02769S (emphasis added). Obviously, domestic commodity programs, implement a different *vehicle* than federal tax credits like EICs, but this does not disqualify Farm Bill payments from exempt status. *See id.* If the Farm Bill payments fulfill the purpose of the exemption for "public assistance benefits" then they are intended to be exempt by the Iowa legislature under § 627.6(8)(a). *See id.* As stated above, in the absence of a statutory definition of "any public assistance benefit" the court has adopted the plain meaning accorded to this phrase by the *Longstreet* court—"government aid to needy, blind, aged, or disabled persons and to dependent children." It is the purpose of the exemption statute to exempt property that falls within this definition as a "public assistance benefit." Most of this definition is inapplicable to this matter as there is no issue as to whether the payments are for, or whether the Wilsons in fact are, blind, aged, disabled or dependent children. There is no contention that Farm Bill payments are not government payments. So, in this matter the only question remaining is whether the Wilsons' Farm Bill payments constitute government aid to the needy.

When the Iowa legislature exempted "any public assistance benefit" without further elaboration it left the determination of which classes of people qualified as needy to the federal, state and local governments.[7] In the case of EIC, the federal government determined that a

---

7. The court disagrees with the position of the bankruptcy court and the Trustee that *Longstreet* requires a "means test," such that the amount of the payment must be inversely correlated to the debtor's income, in order for

government aid payments to qualify as public assistance benefits under the Iowa exemptions statute. *See In re Wilson*, 296 B.R. at 813. The *Longstreet* court merely recognized

class of low income families with qualifying children in the home were "needy." *See Longstreet,* 246 B.R. at 616 (noting that Congress intended to benefit a class composed entirely of low-income families through implementation of the EIC). Likewise, in enacting Farm Bill payments Congress sought to benefit a class which in Congress' view was in need of federal assistance—that class being composed entirely of farmers producing certain commodities that could establish a base acreage and had an adjusted gross income lower than a specified amount. Unfortunately, unlike the EIC Program which has been in existence for over a quarter of a century, the Farm Bill is a very unseasoned piece of legislation which has not yet been examined by any other court outside of this matter. However, it is clear that the underlying purposes of both EIC and Farm Bill payments are the same—both federal programs seek to assist those who are historically disadvantaged a/k/a "needy." Both the Trustee and the bankruptcy court take issue with the fact that a farmer qualifies for payments so long as his average adjusted gross income over the past three years does not exceed $2.5 million—essentially arguing that it is unfathomable that someone with that high of an adjusted gross income could possible

qualify as needy. The court's response to this argument is two-fold. First, the court would reiterate the fact that the Iowa legislature's use of the broad phrase "any public assistance benefit" left the determination of who qualified as needy up to the legislating body. Second, the adjusted gross income reported by farmers is misleading—often this number is high solely due to the farmer's receipt of farm program payments that must be claimed as taxable income. In actuality, according to The Economic Research Service for the United States Department of Agriculture, intermediate farms, defined as those with sales less than $250,000 per year,[8] generated a mere $9,000.00 in farm income in 2002. http://www.ers.usda.gov/Briefing/FarmIncome/wealth.htm. As the reported adjusted gross income gets higher, so does the debt load that the farm is saddled with. *See id.* ("Farm business debt is expected to rise about 3 percent in 2003. Total farm business debt is expected to approach $199 billion by the end of 2003. The more moderate rise in debt follows growth of 4.1 percent in 2002 and 4.5 percent in 2001."). This perspective is reinforced by the statements of the Farm Bill's opponents that the commodity program payments essentially amounted to a welfare program for farmers. *See* 148

---

that the purpose of EIC matched the intent of exemption statutes:

> The task of the exemption statute is to "protect the family from impoverishment." *Davis,* 136 B.R. at 207. The EIC helps fulfill that objective. "The class of persons that Congress intended to benefit by creating the 'Earned Income Credit' Program in 1975 is composed entirely of low-income families." *Sorenson,* 475 U.S. at 866, 106 S.Ct. at 1609 (Stevens, J., dissenting) (citing 121 Cong. Rec. 8861 (1975) (remarks of Sen. Long)). Thus constructing the exemption statute liberally in favor of the Debtor, it follows that an EIC is exempt.

*In re Longstreet,* 246 B.R. at 616. The court cannot find any language in *Longstreet* that would suggest that a debtor's income must be

below "poverty" in order for the payments to constitute a public assistance benefit. *Longstreet* merely recognizes Congress' intent in promulgating the EIC program was to benefit a class of individuals it recognized as needy, which coincides with both the plain meaning accorded to "any public assistance benefit" by the *Longstreet* court and the general purpose of the Iowa exemption statute of protecting the debtor from impoverishment. In this court's view, if the Iowa legislature had intended a "means test" to dictate whether a government payment fell under the exemption for "any public assistance benefit" it would have explicitly so stated.

8. This is the category of farms that the Wilsons' farming operation would fall under.

Cong. Rec. H2022–01, H2042 (statement of Congressman Pombo, California) ("This is the worst possible farm policy that we could adopt in any way. *We turn it into a welfare program.* We try to say that the purpose of farm policy is to support those small, disadvantaged farmers so that they can get a welfare check. Well, if that is what we really want we should just make it a welfare program.") (emphasis added). Construing the exemption liberally in favor of the debtor, the Wilsons' Farm Bill payments are exempt under § 627.6(8)(a) as "public assistance benefits." *See, e.g. In re Honomichl,* 82 B.R. 92, 93 (Bankr. S.D.Iowa 1987); *Matter of Hahn,* 5 B.R. 242, 244 (Bankr.S.D.Iowa 1980); *Frudden Lumber Co. v. Clifton,* 183 N.W.2d 201, 203 (Iowa 1971).

The finding that Farm Bill payments are exempt under § 627.6(8)(a) as "public assistance benefits" is also consistent with the phrase's statutory placement. As discussed above, the federal exemption statute exempts "public assistance benefits" along with social security benefits, veteran's benefits, etc., as they are all akin to future earnings of the debtor. *See* H.R. REP. No. 95–595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6318 (grouping all of the benefits exempted under 11 U.S.C. § 522(d)(10) together as they are "akin to future earnings of the debtor"). Farm Bill payments are similar to the future earnings the farmer-debtor would have obtained were commodity prices stable—similar to how unemployment compensation is akin to what the debtor would have earned were unemployment rates stable. Commodity prices, like unemployment rates, are unpredictable and beyond the control of the benefit recipient. As Farm Bill payments are a reflection of the price the producer would earn from the future sale of his products in a stable commodities market, they are appropriately classified as a "public assistance benefit" under the Iowa exemption statute.

Finally, exempting Farm Bill payments would further both the principles behind the Farm Bill as well as the general purposes behind the Iowa exemption statute. It would further the goals of the Farm Bill in providing a financial safety net to small, rural farmers like the Wilsons, and it would encourage farmers in the same financial position as the Wilsons to continue farming despite their recent financial hardships. It would also further the purpose of exemptions in protecting the Wilsons from impoverishment, preserving their cultural identity, affording a means of financial rehabilitation and spreading the burden of their bankruptcy to their creditors rather than on society. *See In re Davis,* 136 B.R. at 207; *In re Hahn,* 5 B.R. at 244.

Construing the exemption for "public assistance benefits" liberally in a light most favorable to the debtor, and for all of the reasons discussed above, this court finds that the Wilsons' entitlement to direct payments under the Farm Bill are exempt as "public assistance benefits" under Iowa Code § 627.6(8)(a).

## III. CONCLUSION

While this court views the issue in this appeal as a close one, for the reasons previously stated the court accepts the Wilsons' allegations of error by the bankruptcy court in holding that the Wilsons' Farm Bill payments were not exempt as "public assistance benefits." *See* IOWA CODE § 627.6(8)(a). Therefore, the judgment of the bankruptcy court is respectfully **reversed,** and the case is remanded to the bankruptcy court for further proceedings not inconsistent with this opinion.

**IT IS SO ORDERED.**